**In re PERRY COUNTY FOODS, INC., Debtor.**

James G. Henderson, Trustee, Plaintiff,

v.

A. Scott Andrews, Marvin P. Bush, Dwayne L. Shipley, Winston Capital Fund I, L.P., Winston Partners Group, L.P., Andrews–Bush, Inc., Perry County Pizza Company, LLC, d/b/a The Original Gourmet Pizza Company, Perry County Cookie Company, LLC d/b/a The Original Gourmet Cookie Company, Cardinal Consulting Services, Inc., Charles V. Chaffee, Karen J. Chaffee, Clifford W. Chaffee, and Kenneth R. Edelbrock, Defendants.

Bankruptcy No. 96–03768–TRB–7. Adversary No. 98–0006.

United States Bankruptcy Court, N.D. Alabama, Southern Division.

Sept. 2, 2004.

---

Jerry W. Schoel, The Schoel Law Firm, Birmingham, AL, for James G. Henderson, Trustee of the Bankruptcy Estate of Perry County Foods, Inc.

William C. Crenshaw, Powell, Goldstein, Frazer & Murphy, L.L.P., Washington, DC, Michael D. Freeman, Jesse S. Vogtle, Jr., J. Russell Campbell, Gary E. Sullivan, Balch & Bingham, L.L.P., Birmingham, AL, for A. Scott Andrews, Marvin P. Busch, Swayne L. Shipley, Winston Partners, Group, L.P., Andrews–Bush, Inc., Perry County Pizza Co., L.L.C., Perry County Cookie Co., L.L.C. & Cardinal Consulting Corp.

David B. Anderson, Walston, Wells, Anderson & Bains, L.L.P., Birmingham, AL, for Charles V. Chaffee, Karen J. Chaffee, Clifford W. Chaffee, & Kenneth R. Edelbrock.

*Memorandum Opinion On Andrews/Bush/Winston Defendants' Motion In Limine to Exclude Evidence and Deferral of Entry of Summary Judgment.*

THOMAS B. BENNETT, Bankruptcy Judge.

## I. Arabia to Helipolis, the Returns and a Flyover View. That Which is at Issue: Evidence or Not and the Reach of Generalizations.

Our legal system has compartmentalized evidence of what has occurred into categories. One is evidence not accorded recognition by courts due to (a)(i) a lack of a sufficient materiality and/or degree of relevancy, *see, e.g.,* Fed.R.Evid. 401 and 402, (ii) incompetency, including privileges, *see, e.g.,* Fed.R.Evid. 500, 600, 700, 800, 900, and 1000 series, (iii) procedure, *see, e.g.,* Fed.R.Evid. 104 and 105, and (iv) hearsay, *see, e.g.,* Fed.R.Evid. 800 series, or (b) extrinsic reasons, those outside the scope of the Federal Rules of Evidence, such as a constitutional or statutory reason, *see, e.g.,* Fed.R.Evid. 402, or other exclusion basis, *see* Frederick Schauer, *Profiles, Probabilities, and Stereotypes,* Harvard University Press 131–54 (2003). The opposing is evidence which has been decided to be òf the sort which assists, in a law recognized, permissible way, in the demonstration of the occurrence or not of what has transpired. This is the class of evidence which courts and legal commentators refer to as admissible. Admissible evidence is the antecedent to proving the existence of the two, indispensable parts of a claim enforceable in the federal courts of this country: an injury recognized by the law coupled with legally cognizable damages. Without a sufficient degree of evidence of the kind allowed under our jurisprudence to be used to prove both such an injury and damages, no lawsuit is sustainable. Part of what this Court has to do to resolve the legal disputes in this case is apply rules, the Federal Rules of Evidence, which are generalizations dividing the universal set of evidence into the subsets of admissible and inadmissible, along with case law developed generalizations on how these rules are to be implemented.

The evidentiary matters presented in this case compel an inquiry regarding the ability of the trustee of a bankruptcy estate to utilize certain testimony and a report to, at least in part, prove the infliction and extent of the financial harm to Perry County Foods, Inc. (hereinafter sometimes "Foods") supposedly caused by the defendants. More specifically, it is whether an accountant's testimony and the contents of his report proposed for use by Foods' Chapter 7 trustee at trial is of the needed legal character and quality to prove (a) damages arising from (i) contended fraudulent transfers under 11 U.S.C.

§ 548(a)(1)(A) & (B) and a preference count under 11 U.S.C. § 547(b) (2004) for both of which a recovery may be obtained under 11 U.S.C. § 550(a) (2004), (ii) asserted conversions of property, and (iii) an alleged conspiracy to accomplish the contended fraudulent transfers, one of the preferences, and the conversions, and (b) what is part of that which is required to prove a constructively fraudulent transfer, lack of reasonably equivalent value, under § 548(a)(1)(B)(i) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(B)(i) (2004). By a motion in limine, the defendants, A. Scott Andrews, Marvin P. Bush, Dwayne L. Shipley, Winston Capital Fund I, L.P., Winston Partners Group, L.P., Andrews–Bush, Inc., Perry County Pizza Company, L.L.C. d/b/a The Original Gourmet Pizza Company, Perry County Cookie Company, L.L.C. d/b/a The Original Gourmet Cookie Company, and Cardinal Consulting Corporation (hereinafter collectively sometimes "the Andrews/Bush/Winston Defendants") along with Charles V. Chaffee, Karen J. Chaffee, Clifford W. Chaffee, and Kenneth R. Edelbrock (hereinafter collectively sometimes "the Chaffee/Edelbrock Defendants"), seek to exclude the expert's testimony and the contents of his report from the class which the law views as admissible evidence.

Several of the unique aspects of the trustee's case are his premising of the constructively fraudulent transfer cause of action on Foods' sale of all of its products to certain of the defendants and the methodology utilized to prove liability and damages. The trustee's accountant's testimony and the contents of his report contain another singular characteristic in the fraudulent transfer context: utilization of indirect evidence of the value of property asserted to have been transferred as a substitute for direct evidence of both the constructively fraudulent transfer claims and damages. For reasons demonstrated by testing of the accountant's report and testimony using microeconomic theory and

its competitive market analytical tools added to the more standard, expert witness evidence admissibility rules and their case law implementations, the trustee's attempt to prove indirectly that which is usually demonstrated directly requires that the trustee's contended expert's testimony and the contents of the his report be deemed inadmissible evidence. Coupled with this ruling is another which is that the accountant proffered as an expert witness is not one for all of the purposes the trustee offers his testimony and report.

This Court's holding is not a *per se* rejection of use of indirect evidence to establish reasonably equivalent value or damages arising from a constructively fraudulent transfer. Rather and in some instances where done properly, indirect evidence may be admissible for each purpose. In this case, the indirect evidence simply does not meet the law's prerequisites for inclusion in the category called admissible evidence. In the terminology of one commentator, the testimony and report contain generalizations which are non-universal by definition or empirical evidence. They are also not within the classification of the subset of generalizations which are empirically accurate regarding the traits of the majority of the group or a subclass of members of a class compared to the class as a whole. These are the classifications of generalizations which meet a minimal degree of soundness to be relevant evidence. Unfortunately, the trustee's proffered accounting testimony and report fall into the category of spurious generalizations because the contents are empirically unsound and their conceptual foundations sit on unreliable bookkeeping. This proposed expert witness evidence is, therefore, irrelevant and inadmissible. *See* Frederick Schauer, *Profiles, Probabilities, and Stereotypes,* Harvard University Press 3–13 (2003).

Flowing from the determination that this evidence is to be relegated to the grouping denominated inadmissible is a further outcome. It is that summary judg-

ment may be granted against the trustee on counts one, two, three, and six based on the striking of the trustee's proof of damages for the fraudulent transfer claims, one of the preference counts,[1] the conversion, and the conspiracy claims leaving the trustee without legally competent evidence of the necessary damage component for maintaining these causes of action.[2] Pending a status conference to ensure that the trustee has no substitute for the Hart report and testimony, entry of summary judgment is deferred.

## II. The Iterations: The Palm Bird, Five Centuries, and Egypt: Ashes to Ashes, Dust to Dust, or Bjn to Phóinïx to Fenix to Phenix to Phoenix.[3]

### A. Initial Resurrections: Sale of All and Assumption of Some.

Foods has had a relatively short existence. Yet, the products which it provided were made by various predecessor and successor entities over a longer time frame. Indeed, the no less than four enti-

ties producing like products in the same manufacturing facilities evidence the phoenix-like existence of the pizza, cookie, and fundraising businesses each of these entities undertook. However and unlike the phoenix of Egyptian lore, consumption of Foods by bankruptcy foretold the beginning of the end of the string of resurrections. For not long after Foods' bankruptcy case filing in 1996, each of its terminal successors, Perry County Pizza Co., LLC, Perry County Cookie Co., LLC, Delicom Foods, Inc., and Perry County Fundraising, Inc. was unable to operate profitably and went out of business.

In the phoenix's legend as relayed by Herodotus, it had contacts with at least two locations. It lived in the Arabian desert for no less than five hundred years before its self-consumption by flames and on a subsequent birth the depositing of the former's ashes in another place, the Temple of the Sun in Heliopolis. Likewise, Foods had two primary geographic con-

---

1. The preference count is that in count three of the trustee's restated and consolidated complaint. This preference claim is premised on the same argued transfers as those for the fraudulent transfer claims.

2. The entry of this opinion has been delayed for several reasons. One is that what has been presented to this Court as expert opinion is so not such evidentiary matter that a respectable length of pause was taken to ensure that another perspective might not be the better one. The passage of time has not altered this Court's assessment.

 Coupled with this is the need for a caveat regarding what has transpired. This Court's view is that it is not Foods' trustee's fault. Rather, any blame falls on the so-called expert for failing to do what is required of a professional—to be distinguished from one focused on making money—which is to inform a client of not only what is right, but also what is wrong with a case. Given the lack of training and background of a significant number legal professionals in the ever expanding areas requiring technical, scientific, and

quantitative capabilities, it is no longer unexpected that lawyers and judges are unable to bring to bear that which such technical, scientific, and quantitative training and background would accord them. This criticism is not meant to convey that students of the law are not very bright, for many are. It is intended to point out an ever growing problem of our legal system founded on a belief that generalists using verbal based analysis in an increasingly complex, technical, and more quantitative methods based society may broach resolution of what are presented as legal disputes when many are, in reality, technical, scientific, or quantitative in nature. Without more than a rudimentary knowledge of these technical, scientific, and quantitative areas, this has heightened implications in the faster paced manufacturing system for outputs called dispute resolution which is our legal system.

3. These are some of the forms of phoenix from Egyptian to Greek to pre–1150 A.D. English to medieval Latin to the that of present day English.

tacts. Although Foods had Birmingham, Alabama as the location of its corporate headquarters, the locus of its operations and many of the acts complained of by Foods' trustee occurred and/or revolved around its Ohio production, distribution, and sales activities. Over the course of its existence and in the choice of law usage of the word, Foods' pre-bankruptcy activities involved numerous and significant contacts with both Ohio and Alabama.

### (1) Bjn to Phóinïx—Cheese to Perry County Foods, Inc. # 1.

The first incarnation was in 1986 when four of the defendants in this adversary proceeding, Charles V. Chaffee, Karen J. Chaffee, Clifford W. Chaffee (hereinafter collectively sometimes "the Chaffees"), and Kenneth R. Edelbrock (hereinafter sometimes "Edelbrock") formed Perry County Foods, Inc. (hereinafter "P.C.1") for the purpose of buying the business properties of Perry County Cheese, Inc. (hereinafter "Cheese") located in Perry County, Ohio. Although P.C.1 bore the identical name, it had a separate legal existence from that of Foods.

For $350,000.00 paid to Cheese, P.C.1 obtained substantially all of the assets, including the book of business,[4] of Cheese. Yet, it assumed only some of Cheese's debts. The intent of the owners of P.C.1 was that it not assume or otherwise become responsible for certain debts and liabilities of Cheese including sums owed to the United States and the State of Ohio. One of the assumed obligations was the indebtedness of Cheese owed to Huntington National Bank of Fort Wayne, Indiana (hereinafter "Huntington Bank") which on assumption was in excess of $1,500,000.00. This obligation, which had been secured by the inventory, real estate, equipment, and improvements of Cheese, continued to be secured following the assumption. It was the assets of P.C.1 purchased from Cheese, among others, which secured repayment of the assumed Huntington Bank loan. These assets also constituted substantially all of those necessary for the manufacture of the products of Cheese and those of P.C.1.

### (2) Phóinïx to Fenix— P.C.1 to Buckeye.

After P.C.1 acquired Cheese's assets, it suffered operating losses and accumulated additional unpaid obligations, including about $900,000.00 in federal tax liabilities. To hopefully preserve their investments in P.C.1, Edelbrock and the Chaffees loaned monies to P.C.1, bringing the total of monies they advanced to P.C.1 by investments, $350,000.00, and loans, $300,000.00, to an aggregate of $650,000.00. After discovering what has been characterized as a "glitch" in the P.C.1 acquisition of Cheese's assets, i.e., it did not acquire Cheese's assets free from, among others, the liens held by the State of Ohio for taxes and unemployment compensation, Edelbrock and the Chaffees formed Buckeye Pizza Group, Inc. (hereinafter "Buckeye Pizza") for the purpose of transferring the assets of P.C.1 to Buckeye Pizza. As with the P.C.1–Cheese transaction, Buckeye Pizza purchased substantially all of P.C.1's assets and assumed only some of its debts. The aggregate amount of P.C.1's liabilities not assumed by Buckeye Pizza totaled approximately $1,000,000.00. Buckeye Pizza did assume the $1,500,000.00 Huntington Bank indebtedness, repayment of which remained secured by the assets critical to production of the products of P.C.1 and Buckeye Pizza.

Following the assumption of the Huntington Bank obligation, Buckeye Pizza re-

---

**4.** It constituted the persons and entities who/ which purchased P.C.1's products.

financed it with Lincoln National Bank and Trust Company of Fort Wayne, Indiana (hereinafter "Lincoln Bank"). As part of the refinancing, Edelbrock and the Chaffees guaranteed repayment of the Buckeye Pizza obligation to Lincoln Bank. Subsequent to this refinancing, Norwest Bank of Fort Wayne, Indiana (hereinafter "Norwest Bank") acquired Lincoln Bank, becoming the holder of the secured debt of Buckeye Pizza and the guarantees of Edelbrock and the Chaffees. During this time, Buckeye Pizza, just as its demised forerunners had done, operated at a loss and amassed additional debts and liabilities which it could not pay.

### (3) Fenix to Phenix—Buckeye to Deli, the last Perry County Foods, Inc.

Sometime in early 1993, the Chaffee/Edelbrock Defendants were approached by individuals who had been attempting to purchase an existing pizza manufacturing business. These individuals, including two more of the original defendants in this matter, John C. Sanford and Mary Sue Sanford (hereinafter "the Sanfords"), along with Lester Nuby (hereinafter "Nuby"), wanted to purchase Buckeye Pizza. Edelbrock and the Chaffees reached an agreement with Nuby and the Sanfords for the sale of Buckeye Pizza. Nuby and the Sanfords formed the fourth in the succession of entities to own the production facilities and substantially all of the assets of its predecessor iterations. The new entity was Deli Specialty Foods, Inc., (hereinafter "Deli").

In April, 1993 and in a transaction similar to each of the earlier asset acquisitions involving Cheese by P.C.1 and P.C.1 by Buckeye Pizza, Deli purchased the assets of Buckeye Pizza while assuming only certain of its debts and liabilities. The debts and liabilities assumed by Deli approximated $3,500,000.00. Once again included was the $1,500,000.00 obligation which had been refinanced by Norwest Bank. Also included was the $300,000.00 loan which had been made by Edelbrock and the Chaffees for which Buckeye Pizza had become liable by its assumption as part of the P.C.1–Buckeye Pizza transfer. As part of the purchase transaction from Buckeye Pizza, Deli issued five percent of its capital stock to Edelbrock and the Chaffees.

Immediately following the purchase of Buckeye Pizza's assets, Deli changed its name to Perry County Foods, Inc. It is this entity which is the debtor, Foods, in this case. This version of Perry County Foods, Inc. began producing pizza, cookie, and fundraising products under the trade names acquired from Buckeye Pizza. Later in 1993, Edelbrock and the Chaffees purchased an additional five percent of Foods' stock for the sum of $500,000.00 to allegedly avoid a lawsuit over their misrepresentations regarding the profitability— later discerned to be a lack thereof— which, in significant part, supposedly induced the renamed Deli, Foods, to purchase Buckeye Pizza's assets.

### B. Variation of the Tale: Immolation on the Altar and not in the Desert [5] —Another Format: New Capital, Same Entity.

By the end of 1994, Foods had increased its sales from the range of $2,000,000.00 to $3,000,000.00 to that of $11,000,000.00 to $12,000,000.00. It was then selling most of its output of pizzas and cookies to Kroger,

---

**5.** One version has the phoenix burned in the Arabian desert. Then on the birth of the new phoenix, the ashes of the old are embalmed in an egg of myrrh which is transported to the alter of the Temple of the Sun. The other has the phoenix near the end of its five century lifespan fly to Helopolis. Its combustion is on the altar of the Temple of the Sun followed by birth of another phoenix.

Bruno's, and Safeway grocery stores. Despite the approximate four hundred percent increase in sales, Foods needed more operating capital—that is cash—and looked for other investors for an infusion of monies so it could, at a minimum, maintain its higher level of business operations. With the assistance of Dwayne L. Shipley (hereinafter sometimes "Shipley") of Cardinal Consulting Services, Inc., each of which is a defendant in this case, Foods entered into negotiations with A. Scott Andrews (hereinafter sometimes "Andrews") and Marvin P. Bush (hereinafter sometimes "Bush") of Winston Capital Fund I, Ltd. (hereinafter sometimes "Winston Capital").[6] During the period when Winston Capital was assessing whether to acquire an ownership interest, Foods provided financial records to Winston Capital which reflected that Foods had a net loss of just under $900,000.00 for the period January 1 through October 9, 1994. Based partly on this financial information and what the anticipated losses would be for all of 1994, Winston Capital purchased stock issued by Foods so its ownership of the capital stock Foods was 49.9%. The stock purchase occurred during the period of late December, 1994 to early January, 1995. It resulted in Winston Capital paying $2,000,000.00 to Foods. At this time, Andrews and Bush became directors of Foods and each remained so until its bankruptcy filing. As part of the agreement between Winston Capital and Foods, Foods paid $650,000.00 of the proceeds received from Winston Capital to Norwest Bank to reduce Foods' liability to the bank. Correspondingly, this reduced the dollar amount of the guarantee obligations of Edelbrock and the Chaffees on the Nor-

west Bank debt. Following Winston Capital's investment, a material inaccuracy in Foods' internal accounting records became known to the Andrews/Bush/Winston Defendants: the true net loss by Foods in 1994 exceeded $2,300,000.00 and was $1,935,641.00 greater than projected.

Despite Winston Capital's investment, Foods continued to operate with small cash reserves. This was caused by (i) continued losses from operations, (ii) the $650,000.00 payment on the Norwest Bank indebtedness, (iii) Foods' purchase of used, inefficient equipment to upgrade plant efficiency instead of the new equipment called for as part of why Winston Capital made its investment decision, and (iv) Foods' production and distribution of pizzas to its customers which had been produced with tainted pepperoni.

The bad pepperoni had been supplied by H & M Food Systems, Inc. (hereinafter "H & M") for Foods' April and May, 1995 production of pizzas. The problem with the pepperoni was that it turned grayish white in color. The impact was dramatic. Three recalls of pizzas were necessitated. Potential consumers did not buy pizzas with gray pepperoni and Foods' relationships with its customers were harmed. This aggravated the financial difficulties facing Foods, especially its cash flow. By August of 1995, Foods had had hundreds of its checks returned as a result of having insufficient funds on deposit. During 1995 due to these ongoing financial problems, Foods borrowed about $900,000.00 on a short term basis from Winston Partners and had repaid only $120,000.00 of these borrowings by the fall of 1995. Winston Partners claims it was owed $800,000.00 at

---

6. Winston Capital Fund I, Ltd. is an entity comprised of Winston Partners Group, L.P. (hereinafter Winston Partners), and Andrews–Bush, Inc. A. Scott Andrews and Marvin P. Bush are managing directors and controlling

persons of Winston Partners. Andrews–Bush, Inc., is a corporation whose officers, directors, and shareholders include A. Scott Andrews and Marvin P. Bush.

the time of Foods' bankruptcy filing. However, one of the evidentiary exhibits, the Terre Nova Memorandum, reflects that this sum may have been the basis of an increase in Winston Capital's ownership interest in Foods to seventy percent. In all events, what was evident by late 1995 was that, once more, the metamorphosing process of Foods had progressed along the destruction-resurrection process to a point just shy of its incineration in the flames of insolvency.

From mid to late 1995 in an attempt to smother this engulfing process, Andrews, Bush, Shipley, Winston Capital, Edelbrock and the Chaffees tried to locate new investors for another capitalization of Foods. Some of this group of individuals also conceptualized a plan for, hopefully, staunching Foods' losses and turning it profitable. The restructuring of Foods' business operations was implemented in the form of what was to be a last reincarnation of the businesses of Foods. Also in the later part of 1995, Foods sued H & M over the bad pepperoni H & M had sold it. In the civil action against H & M, the trustee contended that Foods' financial demise was caused by the tainted pepperoni which resulted in Foods becoming virtually worthless by late 1995. This position is at variance with what the trustee pleads in this matter in the fraudulent transfer, one of the preference, the conversion, and the conspiracy claims.

### C. Phenix to Phoenix or The Last Resurrection and the After Life—New Entities Purchase the Dough and the Departure from Worldly Operations.

It is the characterization of what happened in the fall and later part of 1995

which is the gist of the disagreement between the trustee of Foods and the defendants. No one disputes that by this time Foods had burned its available cash, other of its liquid assets had been dissipated in its ongoing business operations, and that is was in financial extremis.[7] By late 1995 and just like the phoenix, the self immolation of Foods was close to the point of its being totally ashes and dust.

The pictures sought to be portrayed of the actions of the defendants by the various parties are juxtaposed. The defendants contend that lawyers for Foods advised it that the bad pepperoni case against H & M would be harmed if Foods did not continue in business in some fashion. The plan to keep it in business was, in part, designed to reduce Foods' operations to what was viewed as that part of its businesses which could be operated profitably joined with a cash infusion of $300,000.00 without which Foods could no longer continue in business. The other perspective of what occurred, that of the trustee of Foods, is the consumption by the defendants of what was left of the so-called valuable properties of Foods for the benefit of new entities formed to acquire some of Foods' properties. For purposes of this opinion, this Court need not resolve which party's description is the appropriate one.

What happened in the fall of 1995 is that two new entities were created for the purpose of selling pizzas, fundraising kits, and cookies to third parties. The customers of these new entities were, in significant part in terms of sales volume, former ones of Foods. The new entities formed were Perry County Cookie Company, L.L.C. (hereinafter "Cookie") and Perry

---

7. In fact, the Andrews/Bush/Winston Defendants concede more that the trustee argues regarding insolvency. Although the trustee fixes the point of insolvency for his various causes of action in late 1995, the accountant for the Andrews/Bush/Winston Defendants establishes as part of his report that Foods was insolvent no later than by the end of 1993.

County Pizza Company, L.L.C. (hereinafter "Pizza"). To accomplish this, Foods' scope of operations for pizza, cookie, and fundraising products which had been from manufacturing to marketing to sales was restricted to production of pizza crusts, supplying cookie dough, and making fundraising kits. After Pizza purchased the crusts, it had the pizza production finished by co-packers, marketed, and sold to retail customers. The same basic format was used for the cookie product. Foods sold the raw ingredients to Cookie and Cookie had the cookies finished, marketed, and sold to retailers. Essentially, what the new business plan was to let Foods do what it hopefully could either do profitably or at a lessened loss: manufacture pizza crusts, manufacture and/or obtain cookie dough, and make fundraising kits. Then, Pizza and Cookie were to take care of all the rest of what Foods used to which was completion of the manufacturing process, marketing of the product, and sales.

Cookie's investors included Winston Capital, Delibake USA, Inc., the Chaffees, and Edelbrock. Pizza was established and owned by the same persons and entities which birthed Cookie, with the addition of Steven Misler, a former chief executive officer of Foods and a former defendant in this case, who served as Pizza's president and manager. As part of the structuring of these entities, the trustee contends Foods sold its books of business for pizzas and fund raising—that is its purchasers of product from it—and other assets to Pizza and its book of business for cookies and other assets to Cookie, along with a license to each for the use of Foods' trade names.

The Andrews/Bush/Winston Defendants counter that all that was sold were the licenses. This position is premised in the explicit language of each agreement which only references the grant of a license. The wording of the Foods–Pizza license is:

\* \* \* \* \* \*

Perry County Foods, Inc. grants a ten year license to use the registered trademarks "The Original Parry County Pizza," "Mr. Perry's Homestyle Pizza," "Ginny's Pizza," "Casa Grande," and "Delimark", [sic] in connection with the sale of pizzas and components.

\* \* \* \* \* \*

Pearce Rep. Exhibit 1. That for the Foods–Cookie license is:

\* \* \* \* \* \*

Perry County Foods, Inc. grants a ten year license to use the name "Perry County" in connection with the sale of cookies.

\* \* \* \* \* \*

Pearce Rep. Exhibit 1.

Although not evident from the trustee's suit contentions and not at odds with the fact that the wording of each agreement depicts only the grant of a license, the basis of the trustee's position that other assets of Foods were obtained by Pizza and Cookie is almost totally subsumed in his theory that Foods' assets were consumed in its ongoing production of pizza crusts and fundraising kits for Pizza and supplying cookie dough to Cookie. The reason this has to be the case is that no other evidence of sales or taking of foods' assets of the magnitude contended by the trustee is presented and no other means is offered for how Pizza and Cookie obtained these assets in the amount necessary to approach the value claimed by the trustee.[8] The critical importance of understanding this factor in the trustee's theory is that it

---

**8.** There are several other claims not the subject matter of this opinion which are so insignificant in the aggregate that they do not account for what the trustee argues happened. *See also* n.10, 11 *infra*.

means one of his accountant's means for proof of a constructively fraudulent transfer and of damages, the Ascribed Value Theory, is premised mostly on the underlying rationale of the accountant's other concept of how to prove both liability under 11 U.S.C. § 548(a)(1)(B)(i) (2004) and damages for all of the trustee's fraudulent transfer, conversion, and conspiracy causes of action along with the preference claims in count three. It is the Consumption Theory.

The Foods' properties which all parties agree are part of what was transferred to Pizza and Cookie are the respective licenses and certain product sales. The licenses were purchased for the aggregate sum of $300,000.00 with $150,000.00 being paid by Pizza to Foods for one, and the identical sum being paid by Cookie to Foods for the other. Relatively contemporaneous with the license transactions, Foods contracted with Pizza and Cookie for the sale of substantially all of their respective needs for raw materials, mostly pizza crusts and cookie dough.[9] From this point forward, Pizza, Cookie, and for a very short period, if at all, Cookie's successor Delicom Sweet Goods, Inc. (hereinafter "Delicom") were the only customers for Foods' production of pizza crusts and cookie dough.

Although the Andrews/Bush/Winston Defendants have submitted evidence in the form of deposition testimony of its plant manager that Foods made a profit from its sales to Pizza and Foods, this contention is disputed by the trustee. It is ambiguous, at best, because of the absence of any clear identification by this person of just what profit—operating, net, or otherwise—was supposedly earned. It is shown to be un-questionably incorrect by the contents of exhibits to the report of the Andrews/Bush/Winston Defendants' accounting expert which evidence operating and net losses for Foods during the entirety of January 1 to June 3, 1996.

By early 1996, Winston Partners was searching for a purchaser of its interests in Pizza and Cookie. On April 3, 1996, an investment understanding by and between Winston Partners and The Chart Group, Ltd., a New York venture capital firm, (hereinafter sometimes the "Chart Group") was reached. This agreement is referred to as the Terre Nova Memorandum. Under the Terre Nova Memorandum, the Chart Group tentatively agreed to purchase, among various interests in many entities, Winston Partners' ownership share of Pizza and Cookie for approximately $2,000,000.00. Exactly two months later on June 3, 1996, Foods filed a voluntary petition under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 701 *et seq.* (2004). Shortly thereafter, the Terre Nova Memorandum was rescinded by the Chart Group. More bluntly, the acquisition by the Chart Group of Winston Partners's ownership interests in Pizza and Cookie never happened.

Just prior to Foods' bankruptcy filing, Pizza sold the fundraising business portion of its operations to another entity, Perry County Fundraising, Inc., (hereinafter "Fundraising") which had been created and was owned by Mary and Harold Rosenfield (hereinafter "the Rosenfields"). Fundraising and the Rosenfields were each initially defendants in this case. Fundraising's existence was not significantly different in duration than that of

---

9. For a short time in the Spring of 1996, Foods baked cookie dough for Cookie following Tennessee Biscuits ceasing to do so. Also, it does not appear in terms of dollar value that much in the way of fundraising products was sold by Foods following the Cookie/Pizza formations to either Pizza or its successor in the fundraising kit business, Perry County Fundraising, Inc.

Pizza, Cookie, and Delicom. Ultimately, Pizza ceased doing business in December, 1996, and Cookie, by letter agreement dated May 31, 1996, sold its inventory, raw materials, and retail accounts to Delicom. The purchase price was $30,605.26 in cash for Cookie's inventory plus a monthly payment of royalties up to an aggregate maximum of $725,000.00. Only two royalty payments totaling $2,705.92 were ever made by Delicom. Cookie and Delicom both went out of business relatively shortly after this sale.

During its five months of operations, Cookie had total sales of $536,106.04 and a net loss from operations of $55,588.06. Similarly, Pizza's period of operations from March through December, 1996 generated gross sales of $800,850.57 and a net loss of $270,790.77. The financial performances of Pizza and Cookie belie the trustee's accountant's assertions of just how valuable Foods was and the Chart Group's assessment of Pizza's and Cookie's entry valuations.

One added, material event occurred after Foods commenced its bankruptcy case. The litigation between Foods and H & M over the bad pepperoni supplied to Foods for its pizza product was settled upon the trustee's receipt of slightly over $1,038,000.00 composed of cash and other consideration.

As is apparent from what happened to Pizza and Cookie, their lifespans were far short of the centuries accorded the palm bird and they did not have enhanced vibrancy following Foods' conflagration. In any fair assessment of the trustee's claims, the destruction-reincarnation sequence of the businesses of Foods lends some credence to a belief that something untoward may have occurred. Unfortunately for the trustee, beliefs and appearances, without more, do not establish a case to the level mandated by the law.

### III. Liability and Damages— The Proof is in the ...?

#### A. Trustee's View.

The trustee of Foods filed an adversary proceeding against the defendants alleging, *inter alia*, (i) the defendants fraudulently transferred properties of Foods to Pizza and Cookie, (ii) Pizza, Cookie, and other of the defendants, converted Foods' properties, (iii) a conspiracy among the defendants to accomplish the fraudulent transfers, one of the preference claims, and the conversion of certain of Foods' properties, and (iv) amorphously described preference claims in count three founded on the properties allegedly fraudulent transferred as also being preferential transfers.[10] The fraudulent transfer

---

**10.** Other claims set forth in the amended complaint are not germaine to this opinion. One is for receipt of preferences as detailed in counts eight and nine in the form of a security interests and liens obtained by the Chaffee/Edelbrock Defendants against assets of Foods to partially secure repayment of an antecedent debt totaling approximately $700,000.00. The so-called security had a value of only a very small fraction of the debt amount. These preference claims were resolved by relinquishment of the security interest and lien by the Chaffee/Edelbrock Defendants. Other preference claims were asserted against the Sanfords in counts eleven and twelve for recovery of payments made on a

pre-bankruptcy debt. These counts along with a fraudulent transfer claim in count thirteen against Mrs. Sanford were severed from this action. In the severed actions, judgments totaling $ 84,951.84 plus pre-judgment and post-judgment interest have been entered against the Sanfords with respect to what were counts eleven and twelve of the trustee's restated and consolidated complaint. What had been the fraudulent transfer claim in count thirteen against Mrs. Sanford was mooted by the preference judgment entered against her. Two lien avoidance claims are posited with respect to Winston Capital in counts four and five. These contentions are not contested by Winston Capital and it has

causes of action are predicated on both the actual and constructive types encompassed within § 548(a)(1)(A) & (B) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(A) & (B) (2004), the count three preference claims rely on § 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b) (2004), recovery for the fraudulent transfers and preferences is predicated on § 550(a) of the Bankruptcy Code, 11 U.S.C. § 550(a) (2004), and the conversion and conspiracy claims are premised on state law. The parties have assumed that the applicable law for the conversion and conspiracy assertions is for all issues that of Alabama. This Court does not.

In an effort to prove damages supposedly resulting from the conversion, fraudulent transfers, one of the preferences, and the conspiracy, and, in part, to show less than reasonably equivalent value as part of the trustee's required proof of liability under § 548(a)(1)(B)(i) and his allowed recovery under § 550(a) of the Bankruptcy Code, 11 U.S.C. §§ 548(a)(1)(B)(i), 550(a) (2004), the Trustee intends to proffer James L. Hart (hereinafter "Hart"), a certified public accountant ("CPA") and who is also a forensic accountant, to testify on the contents of his report including his valuation of the supposedly fraudulently transferred or converted assets of Foods. According to Hart, the aggregate value of the property fraudulently transferred from Foods to Pizza and Cookie or converted by Pizza and Cookie with the other defendants' assistance exceeds $2,179,516.00 under one part of his formulations used to justify his ultimate conclusion of $2,571,428.00.[11]

never sought to enforce these liens post the bankruptcy of Foods. The trustee also delineates in count three a preference claim against Winston Capital and others for the consumed assets and in count fourteen a preference claim against only Winston Partners for two payments. The two payment one in count fourteen involves reimbursements for $4,486.37 and $3,762.57. It remains unresolved. The preference claims in count three based on consumed assets are factually identical to the fraudulent transfer cause of action except for the consumed properties being classified as preferences instead of fraudulent transfers. After its severance, the count nine claims against Delicom Sweet Goods, Inc. were dismissed. With respect to all claims against Steven Misler and the Ashmar Group, these were settled for the payment of $5,000.00 to the bankruptcy estate and each has been dismissed as a defendant. Likewise, the trustee's claims against Delibake USA, Inc. were dismissed following a joint motion by the trustee and Delibake USA, Inc. Lastly, this Court has granted summary judgment in favor of all of the defendants and against the trustee on the claims of conspiracy to commit a constructively fraudulent transfer.

11. Since the preference claim in count three relies on the identical types of transfers as those for the fraudulent transfer contentions in count one, they had to have been accomplished by the same means as the argued fraudulent transfers. This result is the Consumption Theory is how a "transfer" of properties for 11 U.S.C. § 547(b) purposes is argued by the trustee to have happened. That this is how such transfers supposedly occurred is supported by the trustee's complaint in paragraph 8.i. which in pertinent part contains the language:

... used virtually all of the accounts receivable owed to Perry County Foods as of September 15, 1995, and collected in the succeeding several months, and the existing inventory, for the acquisition of goods and/or services related to the production of cookies or pizza and pizza components and for actual production of finished goods for the benefit of Perry County Cookie, Perry County Pizza and their respective stockholders.

Further, the representation of the trustee in his "Memorandum Brief in Opposition to the Motion for Summary Judgment" as filed by the Defendant Edlebrock and the Chaffee Defendants" also buttresses the fact that the overwhelming amount of the value of what is alleged to have been transferred and the damages arising therefrom was by Foods' properties having been "consumed" in the production of pizza crusts, cookie product, and fundraising kits for Pizza and Cookie. The wording is:

As a tactical response, the defendants have filed a Motion in Limine to strike the report and exclude the testimony of Hart. A portion of the support for why the offered report and testimony should be excluded from evidence is the report and testimony offered by J. Wray Pearce, also a CPA, that Hart did not utilize generally accepted accounting principles in (i) his calculations of the value of Foods, Pizza, and Cookie and (ii) his formulations of two methodologies for valuation of the claimed fraudulently transferred or converted properties. Despite the trustee's protest over the names, these Hart methods of valuation have been aptly denominated by the defendants as the Consumption Theory and the Ascribed Value Theory.

> In addition, the balance of the assets of Perry County Foods consisting of its accounts receivable, inventory and prepaid expenses were transferred to the successor new companies by virtue of their use and consumption, not for the purposes of paying the existing obligations of Perry County Foods, but for the purpose of manufacturing product of the benefit of the two new companies. . . .
>
> \* \* \* \* \* \*
>
> . . . Perry County Foods' operation was continued at the expense of the cash equivalent assets of Perry County Foods for the purpose of manufacturing product for Perry County Cookie Company and Perry County Pizza Company.
>
> During the period of time from November 16, 1995, . . . through the date of the filing of the bankruptcy case, Perry County Pizza Company and Perry County Cookie Company removed all or substantially all of the valuable assets of Perry County Foods by collecting and using the accounts receivable and using the inventory on hand in the approximate combined amount of $2 million plus the $300,000 paid for licensing fees to pay the expenses of operating the Mount Perry facility, including utilities and labor, and purchasing raw material for the manufacture [by Foods] of product for Perry County Cookie Company and Perry County Pizza Company.

For this reason, the analysis of the fraudulent transfer claims' damages measure has equal

To counteract the Pearce report and testimony presented during the evidentiary hearing on the motion in limine, the Trustee offered another CPA, Ralph Summerford. Mr. Summerford testified, among other things, that Hart did use generally accepted accounting principles when he valued Foods, but that he, Summerford, had never encountered the methods Hart employed to demonstrate the value of the assets obtained from Foods.

### B. Accounting, Bookkeeping, and Expertise.

#### (1) Consumed or Lost—Is There a Difference?

The first of the two Hart methodologies considered is the Consumption Theory.

impact on that for the count three preference cause of action. This is why a discussion of count three's preference allegations will not be separately presented. For the value of property sought in the count one fraudulent transfer claim is no different from that for this preference claim: each entail alleged transfers of the identical properties of Foods.

An added complication for the trustee is that these portions of his complaint coupled with his memorandum representations reveal when considering the Hart accounting report and testimony that at least $2,179,516.00, if not more or all, of the $2,571,428.00 in transfers and damages were the result of the "cash assets" having been consumed by Foods continued production of products for Pizza and Cookie. It is also the loss associated with the continued making of pizza crust, cookie dough, and fundraising kits sold almost entirely to Pizza and Cookie. This is precisely what Mr. Hart represents in "Supporting Point 6" of his report. Any argument by the trustee to the contrary is wrong. Should the trustee pursue such a contrary position, it undercuts the Hart report and testimony by making his "consumed" postulate unsupported by any alternative position the trustee may present for what occurred. Essentially, therefore, what the trustee's case revolves about is an argument that the challenged transfers occurred because Foods continued to produce crusts, cookie material, and fundraising kits when it should not have because the price(s) received were too low.

Its premise is simple. Since during the relevant time Foods only sold its products to Pizza and Cookie, the overwhelming amount of the loss in the value of Foods' assets arose solely from losses incurred by the manufacturing and sales of Foods' pizza crusts and cookie dough to Pizza and Cookie.[12] The Consumption Theory begins by looking at what are referred to as the "cash assets" of the company as set forth in company's internally prepared financial statements for December 31, 1995. Cash assets, as defined by Hart, includes cash, accounts receivable, inventory, prepaid expenses, and licensing agreement receivables. Although Hart admits that a $299,000.00 licensing agreement receivable was paid to Foods by Pizza and Cookie, it is built back into "cash assets" as being cash received which was later consumed in Foods continued production of products for Pizza and Cookie.

Using Foods' internal accounting documents, Hart concluded these cash assets totaled $2,522,277.00 on December 31, 1995. Hart then used the bankruptcy schedules filed on June 3, 1996 to compute the amount of cash assets as of the date of Foods' bankruptcy filing. Hart determined that in June, 1996 they were $349,008.00. Next, Hart subtracted the bankruptcy petition calculated amount from the December 31, 1995 internal financial records determined number to find what he espouses is the loss in value of cash assets by Foods from its manufacturing and sales of outputs to Cookie and Pizza. Hart asserts these transfers aggregated $2,179,516.00. It is significant, but

not necessarily dispositive, that Hart, Pearce, the defendant's controverting CPA, and Summerford, the trustee's vouching CPA, each testified that none had ever previously used, heard, read about, or encountered the Consumption Theory.

Under the Consumption Theory, Foods' supposed loss of cash asset value of $2,179,516.00 between December 31, 1995 and June of 1996, was the exclusive result of these cash assets having been consumed by Foods in the manufacture of pizza crusts, fundraising kits, and cookie dough sold to Pizza and Cookie. Although not expressly stated in the trustee's fraudulent transfer and conversion claims, implicit in Hart's position is the assumption that the sale prices for the pizza crusts, fundraising kits, and cookie dough were below a "reasonably equivalent value" price as that term is used in 11 U.S.C. § 548(a)(1)(B)(i) or below their market value for conversion claim purposes.

Hart also notes in his report that the $2,179,516.00 loss in asset value under the Consumption Theory does not include the loss of "other types of assets and things of value, such as production facilities, equipment, and goodwill." To account for these assets, Hart has employed an alternative methodology. This other method is the second analyzed by this Court.

Like the variant in the story of the phoenix which shifts the locus of the burning and new birth from the Arabian desert to the Temple of the Sun in Heliopolis, Hart's other conception, the Ascribed Value Theory, is a variation on the consumption theme. It is unlike in the respect that

---

12. Although for a very short period Delicom may have purchased some cookie product form Foods, Mr. Hart does not attempt to ascertain how much, if any, such sales occurred. Nor are these sales segregated from those of Foods to Cookie and Pizza. Instead, all sales by Foods to Cookie, Pizza, and, should any have occurred, Delicom are lumped into one number by both of the Hart valuation techniques. The same is true for the fundraising kits sold to Fundraising from May, 1996 to Foods' demise. These, if any were sold, are lumped into Hart's transfer/conversion/conspiracy/preference calculations and are not separated by time frame, entity, or person.

the Egyptian tale is not otherwise altered and remains specific in purpose as seen by its adherence to the religious beliefs regarding the sun. Whereas, the Ascribed Value Theory changes a little that determined under the Consumption Theory and both methods obscure what is being done in a sandstorm of so-called accounting.

### (2) The Arithmetic—Dividing and Extrapolating for Ascribing.

The testimony of the three accountants given at the hearing on the motion to exclude the Hart evidence demonstrates their agreement on one aspect the Ascribed Value Theory has in common with the Consumption Theory. None of the testifying accountants recalls having used, heard, read about, or encountered it. In calculating the loss under this theory, Hart extrapolates the values of Pizza and Cookie "ascribed" to each in what is, as evidence by its red herring statements, a private placement investment memorandum, the Terre Nova Memorandum, to determine a value for Foods. The Terre Nova Memorandum contains "entry valuations" for interests in Pizza and Cookie which the trustee argues were the then contended 1996 value of Winston Capital's 70% ownership interest in Pizza and Cookie. The Terre Nova Memorandum set forth values are $500,000.00 for Cookie and $1,300,000.00 for Pizza. Foods' entry valuation was $200,000.00. These valuations were determined by the Chart Group in conjunction with Winston Partners from information supplied by Winston Partners for purposes of valuing the entities after (i) the Chart Group's investment of about $2,000,000.00, (ii) an infusion of new monies, $500,000.00, by the Abela Group for a twenty-five percent interest in Pizza, and (iii) hypothesized amounts for future sales, expenses, and profits of Cookie and Pizza. None of these three groupings of events on which the Terre Nova Memorandum values are premised ever materialized.

Based on the Terre Nova Memorandum, Hart arithmetically extends the entry valuations for Pizza and Cookie to determine the 100% valuation of the two entities.[13] He divided each valuation by .70. This represented Winston Capital's ownership of Foods as set forth in the Terre Nova Memorandum.[14] Hart's extrapolations resulted in an argued market valuation of the ownership interest of Cookie of $714,285.00 and Pizza of $1,857,143.00. Hart then added these two numbers to

---

**13.** Hart uses the Terre Nova Memorandum values which are *not* asset values of Pizza and Cookie, rather they are ownership values predicated on, among other things, the future earning potential of each.

**14.** This is, thus, not a methodology which currently values the then owned properties of either Pizza or Cookie. Hart does not use the Winston Capital's 45% interest in Cookie and 65% in Pizza set forth just below that for Foods. No explanation is given by Hart for why he did not use these other percentages. Possibly, the Andrews/Bush/Winston Defendants do not point out this discrepancy because to do so would only increase the monies sought by the trustee under the Ascribed Value Theory's calculation methods.

There is another inconsistency between some of the evidence and the contents of various memoranda. Although it appears that Winston Capital held legal title to the ownership interests of some of the Andrews/Bush/Winston Defendants in Foods, portions of the arguments indicate it was Winston Partners. This confusion arises from definitions of the "Winston" defendants in the briefs, "Winston" being undefined in the affidavit of A. Scott Andrews, and Winston Partners being one of the owners of Winston Capital. It is also made more convoluted by the (i) Terre Nova Memorandum's references to Winston Partners, Winston, and Winston Capital Fund I, *L.P.* and (ii) the restated and consolidated complaint's caption and portions of its text naming and referencing Winston Capital Fund I, *L.P.* This confused state of names and which owned what does not alter how the issues considered are decided.

reach a total valuation for the two companies of $2,571,428.00.

Hart's Ascribed Value Theory is just as simplistic as his Consumption Theory. It is that because the value of Pizza and Cookie came solely from the purchase of the licenses, joined with the argued obtaining of the benefit of its books of business, raw materials and inventory, and the purchase of crusts, dough, and fundraising kits from Foods, the resulting value of Pizza and Cookie must be the amount of damages to Foods from either (i) the transfers by asset and product sales from it to them or (ii) the conversion of Foods' properties by Pizza and Cookie. Next, it is argued Foods' recovery/damages from either receipt of less than reasonably equivalent value and/or conversion of its properties is the aggregate market value of Pizza and Cookie based on what is ascertained from the Terre Nova Memorandum valuations of Pizza and Cookie: $2,571,428.00.

## IV. Inclusion or Exclusion: Generalizations All, Wrapped in the Cloak Called Rules.

■ A main focus of the admissibility inquiry is on the generalization of what testimony of experts is included or excluded under Rule 702 of the Federal Rules of Evidence and how other generalized principles have been developed by courts for its application. What is set forth in this rule is:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court of the United States expounded on what Rule 702 requires before expert opinion evidence may be admitted. Holding that the adoption of Rule 702 abrogated the " 'general acceptance' test [that had] been the dominant standard for determining the admissibility of novel scientific evidence" as previously specified in *Frye v. United States*, 293 F. 1013 (1923), *Daubert*, 509 U.S. at 585, 113 S.Ct. 2786, the Supreme Court revised the standard, requiring that when "[f]aced with a proffer of expert scientific testimony, ... the trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786. The Supreme Court outlined four non-exclusive factors a court may consider when deciding if scientific testimony will assist the trier of fact: (1) whether the expert's theory can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the theory's rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory has gained a degree of acceptance within the relevant scientific community. *Id.* at 593–94, 113 S.Ct. 2786. Essentially, Rule 702's *Daubert* interpretation requires that before scientific evidence is admitted, the trial judge must determine that it is both relevant and reliable. *Id.* at 594–95, 113 S.Ct. 2786.

The application of the *Daubert* Court's expert testimony screening process was later widened in *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167,

143 L.Ed.2d 238 (1999). In *Kumho,* the Supreme Court reaffirmed its *Daubert* holding, stating that a trial judge is to "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Kumho,* 526 U.S. at 147, 119 S.Ct. 1167, *quoting Daubert,* 509 U.S. at 589, 113 S.Ct. 2786.[15] The Court then pondered the language of Rule 702 and determined that the language of the rule does not differentiate between "scientific knowledge" and "technical" or "other specialized" knowledge. Therefore, trial courts are to not only inquire about the relevancy and reliability of scientific evidence, but also the relevance and reliability of testimony based on other types of "technical" or "specialized knowledge." *Kumho,* 526 U.S. at 147–50, 119 S.Ct. 1167.

In further restating the holding of *Daubert* in *Kumho,* the Court specifies that the *Daubert* factors "do not all necessarily apply even in every instance that the scientific testimony is challenged," and that a trial court may consider those *Daubert* elements necessary to determine the admissibility of the offered expert testimony. *Kumho,* 526 U.S. at 150–52, 119 S.Ct. 1167. This is to say that "whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a partic-ular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153, 119 S.Ct. 1167. The *Kumho* ruling includes the Supreme Court's directive to determine the relevance and reliability of all expert testimony before its admission as evidence, as well as the discretion to determine which, if any, of and how the *Daubert* factors should be applied. Neither *Daubert,* nor *Kumho,* nor the following opinions of the Supreme Court or other courts restrict a trial court's consideration to just these four factors. *See, e.g., Daubert,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469; *Kumho,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238; *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253 (11th Cir.2002); *City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548 (11th Cir.1998).

As for accounting testimony, it is "among the sorts of technical and specialized expertise the use of which is governed by Rule 702 and *Daubert." City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548, 564 n. 17 (11th Cir.1998). Just as with non-scientific, non-technical, and non-specialized evidence, the "burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and its admissibility must be

**15.** Unless one views a universal set—sometimes called a global one—of evidence as what is being discussed in *Daubert* and *Kumho,* that is a set comprised of both legally inadmissible and admissible evidence, the concept that legally admissible evidence may not be reliable is counter to the established concept of relevancy for admissibility purposes. If admissible evidence is not reliable, it is not relevant. This is because encompassed in legal relevancy for the subset denominated as admissible evidence is the necessity of its reliability. Fed.R.Evid. 402. However, when discussing the global set made up of inadmissible and admissible evidence—that is, all evidence whether usable or not from the law's vantage point—that portion which is inadmissible may be relevant in appearance, yet in the law's eyes, unreliable. This fixes it as not relevant in the legal sense. It is also the fact that the Federal Rules of Evidence as generalizations are structured to sometimes exclude from the subset of admissible evidence that which is more reliable and relevant, as relevance is used in its non-Federal Rule of Evidence 402 context, than admissible evidence. Yet, evidence of this pedigree whether it be like the Paradox of the Gatekeeper, the Blue Bus Problem, of something akin is deemed inadmissible by use of generalizations and the reasons behind their development and application. *See* Frederick Schauer, *Profiles. Probabilities, and Stereotypes,* Harvard University Press 79–107 (2003).

shown by a preponderance of the evidence." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir.2002). In this case, the trustee of Foods must meet or exceed these requirements. It is from these formulations of relevance, including the reliability factor coupled with the burden and degree of proof necessary to comply with Fed.R.Evid. 702's contents, that this Court's analysis proceeds.

## V. 'Anqä', Sïmorgh, Ch'i-lin or What is the Source[16]—The Consumption Theory and Searching For an Expert.

### A. Economics, Accounting, and *Daubert* Testing.

### (1) Theory, Aggregates, and the Proxy.

Although the admissibility of the testimony and report might be made by reference to the techniques employed in case law discussing the evidentiary standards of the Federal Rules of Evidence and other such statutes, laws, and rules, this Court has elected not to limit the explanation for its decision to these customary sources. The failure to consider an infrequently turned to vehicle for resolution of the defendant's request to exclude evidence would likely engender a reworking of the accounting which is the basis of the trustee's theories for proving his fraudulent transfer, the count three preference, and the conversion and conspiracy claims without addressing a fundamental flaw in each's make up.

At the same time, a broader examination permits testing in its *Daubert–Kumho* sense of what is a different, though not necessarily faulty in all instances, approach to proving the payment of less than reasonably equivalent value and damages.

This is why something else is warranted. The something else is consideration of whether the Hart testimony and report in support of the Consumption Theory have any validity other than as an exercise in nothing more than the subtraction of the aggregate of one set of numbers for what is called "cash assets" from another set of supposedly the same category of "cash assets." This determination involves use of simple, yet powerful microeconomic tools along with application of certain of its competitive market principles in conjunction with the law on constructively fraudulent transfers under § 548(a)(1)(B)(i) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(B)(i). Although rarely referred to in the bankruptcy and evidence contexts, employing economic theory and analytical devises as a portion of the decisional processes for legal issues is an accepted practice by courts and legal commentators. *See Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 33–47, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (Breyer, J., concurring); *Town of Concord v. Boston Edison Co.*, 915 F.2d 17 (1st Cir. 1990) *Koopmans v. Farm Credit Services of Mid–America, ACA*, 102 F.3d 874 (7th Cir.1996); *Anderson Oldsmobile v. Hofferbert*, 102 F.Supp. 902 (D.Md.1952); *The S.C.L. No. 9*, 37 F.Supp. 386 (E.D.Pa. 1939); *see also Weinstein's Federal Evidence* § 201.10[3] (Joseph M. McLaughlin ed., 2d ed.2004); Phillip Areeda, *AntiTrust Analysis* 7–43 (3d ed.1981); Kenneth G. Dau–Schmidt & Thomas S. Ulen, *Law and Economics Anthology* (1998); Richard A. Posner, *Economic Analysis of Law* (A. James Casner et al. eds., 2d ed.1977); Richard A. Posner, *Antitrust Law* (1976); Charles J. Goetz and Fred S. McChesney, *Antitrust Law* (1998).

---

**16.** Scholars surmise that the mythology of the phoenix is an adaptation from a similar myth of either Islamic origin, 'Anqä', or its Persian version, Sïmorgh, or of Chinese origin, Ch'i-lin.

An initial step is to further understand the scope of the Consumption Theory's reach and how it purports to demonstrate lack of reasonably equivalent value and damages. The Consumption Theory approaches proving liability and damages differently from the standard case law accepted method. It is a theory of recovery for all of Foods' sales of products, its licenses, and what may best be described as benefits obtained by the defendants from Foods' use of certain of its other properties as part of its manufacturing efforts. Thus, it is distinguished from recovery for the sale of one or some of a bankrupt debtor's properties. As such, it is a means by which the trustee attempts to prove many fraudulent transfers over a span of time. In its essential facets, it uses the difference in the value of "cash assets" as reflected in the books and records of Foods as of December 31, 1995 from that shown on Foods' bankruptcy petition which was filed on June 3, 1996. The sum obtained by subtracting one from the other, $2,179,516.00, is the supposed diminution of these assets during this period.

Since the only purchasers of products from Foods during this time frame were Pizza and Cookie, and for insignificant times and sums Delicom and Fundraising (hereinafter Pizza and Fundraising are collectively referred to as "Pizza" and Cookie and Delicom are collectively referred to as "Cookie"), it is the trustee's position that this loss was occasioned by the manufacture and sale of Foods' products to Pizza and Cookie. The assumption is that all of the downward change in the amount of "cash assets" of Foods was caused by or consumed in its making of the pizza, cookie, and fundraising outputs sold to Pizza and Cookie. The trustee inherently posits that this loss is the result of Pizza's and Cookie's not having paid the proper price, that is the reasonably equivalent value price, for what was used to make what was purchased from Foods.[17]

Another aspect of the Consumption Theory is that the trustee's accountant is using the change in "cash assets" as the added amount for all sales of output which should have been received had reasonably equivalent value prices for these outputs been paid. What this does is permit use of a few calculations: summing the values at two different times and subtracting one of the sums from the other. It is a substitute for an amount which would under existing case law be obtained by (i) calculating the difference between the market value and the price paid by Pizza and Cookie for each unit and (ii) totaling these differences. *See, e.g., In re McConnell,* 934 F.2d 662 (5th Cir.1991); *In re Jorges Carpet Mills, Inc.* 41 B.R. 60 (Bankr. E.D.Tenn.1984). If accurate in concept, this allows the trustee to avoid knowing what price was paid for each and every item sold and each's market valuation or price.

Once the operation of the Consumption Theory is known, it is evident that its process is at variance with the typical one for finding less than reasonably equivalent value. Because the Consumption Theory employs the use of aggregates to demonstrate less than reasonably equivalent value for all sales of Foods' products to Pizza and Cookie and the damages sustained, the chosen proxy is an indirect, instead of direct, method of trying to prove each's

---

17. The trustee's accountants and other of his professionals disagree with the defendants on what was transferred or consumed. Unfortunately, the pleadings, memoranda, and analysis of what is alleged to have occurred refute other, shifting positions expressed on behalf of the trustee which are at odds with the Consumption Theory. *See* discussion *supra* n. 11.

occurrence. More simply, the trustee's accountant uses indirect evidence, the decrease in the amount of the "cash assets," as proof of both payment of less than reasonably equivalent value and the amount of monies Foods was entitled to receive had it been paid the market price, its damages, in lieu of comparing each price paid for products to each's reasonably equivalent value damage measuring point, generally the market price.

### (2) Ranges and Points, Prices All.

 The next step is application of bankruptcy case law interpretation of what is reasonably equivalent value for 11 U.S.C. § 548(a)(1)(B)(i) purposes. It is that it is not a fixed point. Rather, it is a continuum starting at market value and stopping just short of an amount or a price sufficiently below market value to be less than reasonably equivalent value. Those courts which have addressed where less than reasonably equivalent value is reached have consistently viewed its location to be a point on a continuum of prices which is at and below to some degree the market value or, in another terminology, the market price of the item. See, e.g., Matter of Fairchild Aircraft Corp., 6 F.3d 1119, 1125–26 (5th Cir.1993) ("Although the minimum quantum necessary to constitute reasonably equivalent value is undecided, it is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value."); In re Viscount Air Services, Inc., 232 B.R. 416, 434 (Bankr.D.Ariz.1998) ("The court looks to see if what the debtor received was 'in the range of a reasonable measure of the value' of what the debtor transferred."); Barber v. Golden Seed Co., Inc., 129 F.3d 382, 387 (7th Cir.1997) ("We have held that the formula for determining reasonably equivalent value is not a fixed mathematical formula. . . ."). Despite this Court's questioning of the case law generalization that a range of values/prices is apt for all market structures and all market conditions within a given market structure, this formulation will be employed because use of a specific price versus a range of prices does not alter this Court's conclusions.[18]

---

18. For instance, the criteria of a purely competitive market in equilibrium would dictate that reasonably equivalent value is the price set by the market forces of supply and demand because both the buyer and seller are price takers. They take the price set by the market place. See George J. Stigler, The Theory of Price 87–91, 176 (3d ed.1966); Richard A. Bilas, Microeconomic Theory 9–15, 159 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, Microeconomics 18–19, 242 (Valerie Ashton ed., 3d ed.1995); see also Robert Cooter & Thomas Ulen, Law & Economics 28 (Andrea Shaw & Debra Lally eds., 3d ed.2000); James M. Henderson & Richard E. Quandt, Microeconomic Theory 86–90 (Seymour E. Harris ed., 1958); C.E. Ferguson, Microeconomic Theory 251–252 (Lloyd G. Reynolds ed., 3d ed.1972); Richard H. Leftwich, The Price System and Resource Allocation 25–33 (3d ed.1966); Edwin G. Dolan & David E. Lindsey, Microeconomics 39–42, 47–51, 172 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, Microeconomics 23–44, 147 (1993). In such an instance, a price less than reasonably equivalent value would be a price below the price set in such a market. In another market structure, a different result may obtain.

If one views reasonably equivalent value and the price range described for it under present case law as a generalization which is nonuniversal, yet not spurious, it may be argued in the Schauerian sense, see Federick Schauer, Profiles, Probabilities, and Stereotypes 79–107 (Harvard University Press 2003), that use of a range as the rule for what is reasonably equivalent value rests on a policy of adopting a heuristic as an alternative because the error from such a rule is less than that from one with an individualistic or particularistic bent. Another may be that a more particularized determination is too costly. To achieve this goal, this format for finding where reasonably equivalent value is and is not is one excluding relevant, nonspurious, nonuniversal generalizations from the evidentiary mix of what is used and admissible for Bankruptcy Code purposes under the Federal

So far, the discussion is intended to indicate that paying less than what is the market value price does not demonstrate in isolation from other factors that one paid or received less than reasonably equivalent value for 11 U.S.C. § 548(a)(1)(B)(i)'s purposes.

Joined with using this range description to resolve the evidentiary issues is its application via a model based on the theory of perfect competition. Despite of the Consumption Theory's failure to consider whether Foods' operated in specific geographic and product markets along with the degree of competitiveness in a relevant market, a similar, though more technical, analysis could be made for other market conditions along the uninterrupted progression of market structures from perfect competition to one short of those approaching market conditions clearly not existing for Foods, oligopoly and monopoly. Each application of microeconomic principles in these less than perfectly competitive markets would lead to the same conclusions regarding the Consumption Theory as that determined by use of the simpler, competitive model. This coupled with evidence before the Court that Foods operated in markets closer to one toward the perfect competition end of the spectrum is why this form of economic model is employed. This procedure also avoids resolution of the mentioned problems extant in case law for where less than reasonably equivalent value commences on the pricing continuum—outside a range versus any price lower than the market value price, whether what it is should vary by market structure, and whether the measure of damages should be where existing case law sets it for all market structures—market price/value less price paid/received—instead of the difference between the price/value set at just above the price which is less than reasonably equivalent value when such a price/value is not the market price/value.[19]

Rules of Evidence. In other words, it deems otherwise relevant factors irrelevant for purposes of making the rule achieve its purpose. Conversely, it may be explained by the law's recognizing, most probably not intentional, that there are few, if any, perfect competition markets and the lack of sufficient knowledge of the market to act according to pure competition economic theory. *See also infra* n. 22. Part of this imperfect knowledge arises from not knowing the difference between profit as an economist defines it and how an accountant shows it. One may be losing money under one while making a profit as calculated by the other. Whether the case law view of a range rather than a specific point is the proper perspective is not of moment for deciding this matter for the result in this case is not modified by the law's use of a range of prices and not a point as the price.

19. The perceived anomaly is that for a price less than one which constitutes reasonably equivalent value, the case law established damage measure runs from market value to the price paid. *In re International Ski Service, Inc.*, 119 B.R. 654 (Bankr.W.D.Wis.1990); *Matter of Fitzpatrick*, 73 B.R. 655 (Bankr. W.D.Mo.1985), *aff'd in part, rev'd in part*, 60 B.R. 808 (W.D.Mo.1985); *In re Baker*, 17 B.R. 392 (Bankr.W.D.N.Y.1982). However and where one pays a reasonably equivalent value price that is less than the market value/price, the content of 11 U.S.C. § 548(a)(1)(B)(i) (2004) mandates and case law indicates that no cause of action or damages exist. *In re Phar–Mor, Inc. Securities Litigation*, 185 B.R. 497 (W.D.Pa.1995). When reasonably equivalent value is a range below market value or market price and not just a market value or price, what is the justification for measuring damages at the market value/price less the price paid/received instead of the difference between the price paid/received and some price, other than market price, which is within the continuum of what is a reasonably equivalent value price? The justification here, too, may be that it is a generalization which results in more consistency and accuracy in outcomes or it is a less costly resolution approach. It may also be that it has simply been ignored by litigants and courts. Unfortunately, there are no reported cases resolving whether this appearance is an

Expressed graphically in Figure 1, the selling range below the market price which will not support a constructive fraud claim under § 548(a)(1)(B)(i) is from the point on the continuum just above a price constitut- ing less than reasonably equivalent value, on Figure 1, $P_{lrev}$, to the market price, $P_m$, to prices above the market price such as $P_{>m}$.

**Figure 1**

It is clear under constructive fraudulent transfer *legal* principles that by receiving the market price, $P_m$, and all prices to the right of—greater than—the market price including $P_{>m}$, a bankrupt *seller* or its representative has no cause of action for a constructively fraudulent transfer. For this reason, the relevant range of prices/values received which constitutes reasonably equivalent value for Foods is from $P_m$ to a place just above $P_{lrev}$. The law on proving a constructively fraudulent transfer as it applies to Foods requires that one show a price on the scale at or below $P_{lrev}$. Any price above $P_{lrev}$ does not meet the liability standard for demonstrating less than reasonably equivalent value. Likewise, the recovery measure under 11 U.S.C. § 550(a) is from market price to what was paid. *In re International Ski Service, Inc.,* 119 B.R. 654 (Bankr. W.D.Wis.1990) ("It is generally agreed that 'the market price at the time of transfer is the proper measure of damages....' "(*quoting In re James B. Downing & Co.,* 74 B.R. 906, 911 (Bankr.N.D.Ill. 1987))); *see Matter of Fitzpatrick,* 73 B.R. 655 (Bankr.W.D.Mo.1985), *aff'd in part, rev'd in part,* 60 B.R. 808 (W.D.Mo.1985); *In re Baker,* 17 B.R. 392 (Bankr.W.D.N.Y.

1982); *but see In re Kemmer,* 265 B.R. 224, 235 (Bankr.E.D.Cal.2001) (stating " 'fair market value' is a relevant factor and here serves as an appropriate starting point..." while indicating less than complete agreement with this as a one rule fits all cases proposition).

The point of the line graph is to visualize the fact that the proxy used by the trustee—the aggregate number representing the total amount supposedly paid for all properties below what was a reasonably equivalent value price—does not tell us where on the continuum of prices from market price, $P_m$, to at or below the less than reasonably equivalent value price, $P_{lrev}$, Pizza and Cookie paid for what they obtained from Foods. From a legal standard of proof view, there is an appearance that this is fatal to the trustee's cause of action for the asserted fraudulent transfers and proof of damages. This is not necessarily the case and is revealed by use of microeconomic theory and analysis. For there is a potential instance when a further analysis may indicate that a properly constructed expert's testimony and report might have sufficient basis to be admissible. This next step is to employ a microeconomic model.

anomaly or not, and this Court need not pursue this issue in this case.

### (3) Hieroglyphics and Graphs, Pictures Each.

### (A) Prices, the Market, and One Takes Everything.

This Court has been presented no evidence that Foods had any market power in any of the markets for its products. That is, that it had the ability to obtain a price for its products which is above the price which would be set by the forces of supply and demand in the marketplace. Coupled with this is that Foods, as an entity without such pricing power, would be able to receive the price for its products which is set in each of the relevant markets by the forces of supply and demand. The identical state of affairs existed for Pizza and Cookie. Economists would picture the mathematics of this price setting mechanism in a graph similar to the one below where SS is the supply curve for the market for pizza crusts and DD is the market demand curve for pizza crusts. A graph like this could also be constructed for the market for the cookie product of the kind sold by Foods. *See* Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 21–24 (Valerie Ashton ed., 3d ed.1995); Robert Cooter & Thomas Ulen, *Law & Economics* 31 (Andrea Shaw & Debra Lally eds., 3d ed.2000); Richard H. Leftwich, *The Price System and Resource Allocation* 165–66 (3d ed.1966); Edwin G. Dolan & David E. Lindsey, *Microeconomics* 173 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 48 (1993).

**Figure 2**

For purposes of the discussion from this point forward, this Court assumes that Foods had only one product. This is due to the fact that what is discerned by the analysis for one product would have equal application to all of the products of Foods and the markets for these products in which Foods, Pizza, and Cookie operated.

Because Foods would be able to receive $P_m$—the price indicated by intersection of the market supply and market demand curves in Figure 2—which is the price set by market forces when in equilibrium, it would not, absent some other factor, willingly sell below the market price, say at $P_2$. *See* George J. Stigler, *The Theory of Price* 93, 176–77 (3d ed.1966); Richard A. Bilas, *Microeconomic Theory* 24–31 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 506–09 (Valerie Ashton ed., 3d ed.1995); Robert Cooter & Thomas Ulen, *Law & Economics* 29 (Andrea Shaw & Debra Lally eds., 3d ed.2000); James M. Henderson & Richard E. Quandt, *Microeconomic Theory* 95–96, 109–13, 138–39 (Seymour E. Harris ed., 1958); C.E. Ferguson, *Microeconomic Theory* 8–11 (Lloyd G. Reynolds ed., 3d ed.1972); Richard H. Leftwich, *The Price System and Resource Allocation* 129–30, 160 (3d ed.1966); Edwin G. Dolan & David E. Lindsey, *Microeconomics* 52–59 (Rick Hammonds et al.

eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 138 (1993). To do so would be to sell all of its output for a lower price than it could otherwise receive by sales in the open market. A factor potentially altering this general economic proposition is a fraudulent transfer. For a seller such as Foods, a price below $P_m$ may indicate something awry in the economic sense. However, this alone does not make more or less likely that the receipt of a price below the equilibrium market price is due to a fraudulent transfer. In similar fashion for a buyer of goods, a price paid above the equilibrium market price, for instance $P_1$, may be indicative that something occurred which is not within the perimeters of what general economic principles for a competitive market in equilibrium would dictate. In this type of market structure, one would not in normally pay a price higher than the market price. Again, this may be an indication of a fraudulent transfer from a buyer's perspective. But, it may not. For example and in the instance of a seller receiving a price below that set when the market is in equilibrium or a buyer paying a price above what would be that set in market equilibrium, the market may have a surplus or shortage of the product. In other words, the market is in disequilibrium. It may also be due to another rigidity in the workings of the market. More analysis is necessary.

## (B) Costs and Prices: What is One Without the Other? Accounting Costs Do Not Economic Costs Make a/k/a Profits Under Two Names.

■ The more analysis may be done by viewing certain aspects of the cost structure of a firm selling a product within a particular time span in a competitive market. In economic jargon, one dealing with the short run.[20] Foods would have certain types of costs which change and those which do not. The ones that modulate in the short run are those which vary with output. By definition, these would increase at varying rates as output increases. These are variable costs. *See* Edwin G. Dolan & David E. Lindsey, *Microeconomics* 146 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 128 (1993); George J. Stigler, *The Theory of Price* 136 (3d ed.1966); Richard A. Bilas, *Microeconomic Theory* 140–50 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 198–99 (Valerie Ashton ed., 3d ed.1995); James M. Henderson & Richard E. Quandt, *Microeconomic Theory* 42–43, 55 (Seymour E. Harris ed., 1958); C.E. Ferguson, *Microeconomic Theory* 213 (Lloyd G. Reynolds ed., 3d ed.1972); Richard H. Leftwich, *The Price System and Resource Allocation* 132–33 (3d ed.1966). Another category encompasses costs which will exist and are not alterable in the short run regardless of

---

**20.** The short run is a period during which a producer may increase or decrease output within the existing constraints of its production capacity. It excludes any time frame where output may be increased by added plant capacity or other means which take a longer time to implement such as building a new plant. It, also, is not long enough for new entrants into the market for such a product. *See* George J. Stigler, *The Theory of Price* 134–35, 181 (3d ed.1966); Richard A. Bilas, *Microeconomic Theory* 114–16, 160 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 170, 238 (Valerie Ashton ed., 3d ed.1995); Robert Cooter & Thomas Ulen, *Law & Economics* 28 (Andrea Shaw & Debra Lally eds., 3d ed.2000); James M. Henderson & Richard E. Quandt, *Microeconomic Theory* 89 (Seymour E. Harris ed., 1958); C.E. Ferguson, *Microeconomic Theory* 209, 221 (Lloyd G. Reynolds ed., 3d ed.1972); Richard H. Leftwich, *The Price System and Resource Allocation* 129–30, 160 (3d ed.1966); Edwin G. Dolan & David E. Lindsey, *Microeconomics* 183–88 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 138 (1993).

whether Foods produces: fixed costs. *See* Edwin G. Dolan & David E. Lindsey, *Microeconomics* 145 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 128 (1993); George J. Stigler, *The Theory of Price* 136 (3d ed.1966); Richard A. Bilas, *Microeconomic Theory* 140-50 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 198-99 (Valerie Ashton ed., 3d ed.1995); Robert Cooter & Thomas Ulen, *Law & Economics* 28 (Andrea Shaw & Debra Lally eds., 3d ed.2000); James M. Henderson & Richard E. Quandt, *Microeconomic Theory* 55-56 (Seymour E. Harris ed., 1958); C.E. Ferguson, *Microeconomic Theory* 212 (Lloyd G. Reynolds ed., 3d ed.1972); Richard H. Leftwich, *The Price System and Resource Allocation* 131-32 (3d ed.1966). One fixed cost might be rent. Another may be debt service. More exist. At low output levels, the fixed costs per unit of output would be high and these would decrease, in the relevant range, per unit of output as production increases. A third classification is for the incremental cost of producing an additional unit of output. This is called marginal cost. It starts at a level and decreases at varying rates of decrease as production goes up. Later and as production increases further, the added cost for the marginal units will increase at varying rates of increase. *See* Edwin G. Dolan & David E. Lindsey, *Microeconomics* 149 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 131-35 (1993); George J. Stigler, *The Theory of Price* 136 (3d ed.1966); Richard A. Bilas, *Microeconomic Theory* 140-50 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 198 (Valerie Ashton ed., 3d ed.1995); Robert Cooter & Thomas Ulen, *Law & Economics* 27 (Andrea Shaw & Debra Lally eds., 3d ed.2000); James M. Henderson & Richard E. Quandt, *Microeconomic Theory* 55-58 (Seymour E. Harris ed., 1958); C.E. Ferguson, *Microeconomic Theory* 216 (Lloyd G. Reynolds ed., 3d ed.1972); Richard H. Leftwich, *The Price System and Resource Allocation* 152-55 (3d ed.1966). Once more, a graph may be used to picture the mathematics of these costs for Foods under ordinary short run, competitive market conditions.

**Figure 3**

Figure 3 presents such a typical cost structure. SRAVC is the short run average variable cost, SRAC is the short run average cost which is sometimes called short run average total cost, and MC represents the marginal cost incurred by Foods. The vertical distance between the SRAC and the SRAVC curves represents

the fixed cost of production per unit of output. Similarly, the vertical distance from the SRAC curve to the quantity axis is the average cost per unit of output in the short run and that from the SRAVC to the x-axis is the average variable cost per unit of output in the short run. Under this structure, the output represented by $Q_1$ at the price $P_1$, is where Foods would make what an economist calls "normal profit." *See* Richard A. Bilas, *Microeconomic Theory* 151, 161–63 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 194–95 (Valerie Ashton ed., 3d ed.1995); Robert Cooter & Thomas Ulen, *Law & Economics* 28 (Andrea Shaw & Debra Lally eds., 3d ed.2000); James M. Henderson & Richard E. Quandt, *Microeconomic Theory* 96–97 (Seymour E. Harris ed., 1958); Richard H. Leftwich, *The Price System and Resource Allocation* 168–69 (3d ed.1966); Edwin G. Dolan & David E. Lindsey, *Microeconomics* 142 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 153 (1993). It is where the price, $P_1$, equals the added cost per unit of producing another output, its marginal cost, which is displayed by the MC curve. It is also where the average cost of each unit equals marginal cost and price. So, the price Foods would receive per unit would equal the average cost, *as this cost is defined by economists,* of each unit of output.

Included in the concept of "normal profit" is an amount representing what one could receive in a relatively risk free investment should Foods not produce, but simply use its assets in an alternative way such as purchasing United States treasury obligations. It is referred to as opportunity cost. Edwin G. Dolan & David E. Lindsey, *Microeconomics* 7, 142 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 127 (1993); George J. Stigler, *The Theory of Price* 105 (3d ed.1966); Richard A. Bilas, *Microeco-*

*nomic Theory* 135 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 194 (Valerie Ashton ed., 3d ed.1995); C.E. Ferguson, *Microeconomic Theory* 209(Lloyd G. Reynolds ed., 3d ed.1972); Richard H. Leftwich, *The Price System and Resource Allocation* 127–28 (3d ed.1966). Normal profit calculation via what is encompassed within opportunity costs also includes other implicit costs such as the value of the time devoted to the business by its owners. What are included in determining normal profits under economic theory are both explicit costs or out-of-pocket types of costs like those for raw materials and labor plus implicit costs such as opportunity cost. Edwin G. Dolan & David E. Lindsey, *Microeconomics* 7, 142 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 127 (1993); George J. Stigler, *The Theory of Price* 105 (3d ed.1966); Richard A. Bilas, *Microeconomic Theory* 135 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 194 (Valerie Ashton ed., 3d ed.1995); C.E. Ferguson, *Microeconomic Theory* 209(Lloyd G. Reynolds ed., 3d ed.1972); Richard H. Leftwich, *The Price System and Resource Allocation* 127–28 (3d ed.1966). Collectively, these implicit and explicit costs make up what is defined as economic cost. Under economic theory, opportunity and the other implicit costs are a part of the costs of producing Foods' products and are reflected in the SRAC curve, the average cost of output, the SRAVC curve, the average variable cost, and the MC curve, the marginal cost.

The difference in what an accountant calls profit, accounting profit, and what an economist defines as normal profit is, holding all other factors or variables constant, implicit cost. Richard A. Bilas, *Microeconomic Theory* 151 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 196–97 (Valerie Ashton ed., 3d

ed.1995); Robert Cooter & Thomas Ulen, *Law & Economics* 30 (Andrea Shaw & Debra Lally eds., 3d ed.2000); Richard H. Leftwich, *The Price System and Resource Allocation* 168–69 (3d ed.1966); Edwin G. Dolan & David E. Lindsey, *Microeconomics* 142 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 127 (1993). Since accounting costs for profit determination measure only out-of-pocket or explicit costs, the price at which Foods would earn a "normal profit," shown on Figure 3 as $P_1$, would be above the price at which accounting profit would exist. In other words, $P_1$ on Figure 3 is a price at which Foods under economic theory just meets its costs of producing pizza crusts. Richard A. Bilas, *Microeconomic Theory* 161–62 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 244 (Valerie Ashton ed., 3d ed.1995); Robert Cooter & Thomas Ulen, *Law & Economics* 27 (Andrea Shaw & Debra Lally eds., 3d ed.2000); James M. Henderson & Richard E. Quandt, *Microeconomic Theory* 55–58,89–92 (Seymour E. Harris ed., 1958); C.E. Ferguson, *Microeconomic Theory* 260–61 (Lloyd G. Reynolds ed., 3d ed.1972); Richard H. Leftwich, *The Price System and Resource Allocation* 162 (3d ed.1966); Edwin G. Dolan & David E. Lindsey, *Microeconomics* 174–75 (Rick Hammonds et al. eds., 7th ed.1994). Dissimilarly, records kept using generally accepted accounting principles would show that Foods was making a profit, an accounting profit, of some amount at $P_1$. The significance is that recognition of this difference enables one to determine that Foods' continual loss of monies from its production of outputs under generally accepted accounting principles occurred at a price below $P_1$. This is so because the accounting numbers show an accounting loss and such a loss would only occur at a price below $P_1$. Just how much below $P_1$ is not known.

There is another point on Figure 3 which defines a boundary at which Foods should be indifferent about producing and below which it would shut down production. It is at the price denoted $P_{np}$, the not produce price. This price is at a level of output where it equals Foods' variable costs per unit of output incurred by producing. At a price above $P_{np}$, Foods would in the short run lower its losses by continuing to make its products because a price above $P_{np}$ and below $P_1$ covers all of the variable costs incurred by producing in addition to some of its fixed costs. For a price below $P_{np}$, Foods would stop production because it would increase the amount of its losses by continuing to operate. This is due to the fact that below $P_{np}$ Foods not only does not cover all of its fixed costs, but incurs otherwise avoidable variable costs which are also not covered by the market price. Richard A. Bilas, *Microeconomic Theory* 162–63 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 246 (Valerie Ashton ed., 3d ed.1995); C.E. Ferguson, *Microeconomic Theory* 262–63 (Lloyd G. Reynolds ed., 3d ed.1972); Richard H. Leftwich, *The Price System and Resource Allocation* 164–65 (3d ed.1966); Edwin G. Dolan & David E. Lindsey, *Microeconomics* 178–79 (Rick Hammonds et al. eds., 7th ed.1994).

Looking at this cost structure discloses that the "normal profit" price of $P_1$ and what is designated $P_{np}$ for a price below which Foods will not produce set the potential outside boundaries of a range of prices which are relevant in deciding whether the Consumption Theory has any evidentiary value. Based on the discussion so far and the fact the trustee's theory is presented as one involving only accounting, the range of prices may be narrowed to one that begins at the accounting profit price which is below $P_1$ and runs to a price at or above $P_{np}$. On

Figure 3, $P_2$ designates the point at or above which Foods would make an accounting profit. This reveals that absent some intervening factor, such as a fraudulent transfer, Foods would not produce below $P_{np}$ and in the short run would have operated at a loss which is less than the one that would otherwise occur by producing at prices above $P_{np}$ up to one a little below where it would have made an accounting profit, $P_2$.

A further significant factor is revealed which narrows the applicable range of prices. The price received by Foods had to be below $P_2$. This is the case because of its admitted accounting losses and that suffering such losses requires that the price have been below $P_2$. This still does not disclose the price or prices actually received by Foods for its outputs and how these relate to the market values for what it sold.

Although such an analysis will not enable one to know without more information the exact price or prices paid for Foods' outputs, it does permit one to overlay prices set by the market for Foods' outputs and visualize what is wrong with the Consumption Theory as employed by Foods' trustee's accountant. The overlaying of the price or prices set in the market by supply and demand for pizza crusts is set forth in Figure 4.

**Figure 4**

To do this overlay, two graphs are utilized: a market supply and market demand one similar to that in Figure 2 along with a version of Figure 3 depicting Foods' cost structure. The overlay is of market prices from the market supply/demand graph onto the Foods cost structure graph in Figure 3. This is accomplished by having the price axis of each correspond. Also, several additional market equilibrium points have been set by the inclusion of two more short run demand curves, $D_2D_2$ and $D_3D_3$, and two added supply curves, $S_2$ $S_2$ and $S_3S_3$.[21] What is revealed is as follows.

At a market price of $P_{m2}$, any sales by Foods would have been at a price above the normal profit point. This price would enable Foods to earn what economists define as "pure profit"—one where the price per unit is greater than the total economic cost, implicit plus explicit, per unit of output—which exceeds normal profit for Foods' outputs and is a price higher than

**21.** Effectively, these other market supply and market demand curves could have been presented by two additional graphs. Instead, they have been merged into one by transferring $S_2S_2$, $S_3S_3$, $D_2D_2$, and $D_3D_3$ onto the graph with $S_1S_1$ and $D_1D_1$.

the corresponding prices which would generate an accounting profit and that which would generate a normal profit. Richard A. Bilas, *Microeconomic Theory* 160–61 (1967); James M. Henderson & Richard E. Quandt, *Microeconomic Theory* 96–97 (Seymour E. Harris ed., 1958); Richard H. Leftwich, *The Price System and Resource Allocation* 168–69 (3d ed.1966); Edwin G. Dolan & David E. Lindsey, *Microeconomics* 142, 278–79 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 153 (1993). Due to Foods' sustained losses during the period for which the trustee seeks recovery, Foods did not receive such a price. Likewise and given Foods' losses, the market price that would generate a normal profit, $P_{m1}=P_1$, was not paid to Foods.

In attempting to ascertain the existence of probative evidence that the losses suffered by Foods were the result of Pizza and Cookie paying less than a reasonably equivalent value for the pizza and cookie products, two other prices need to be considered. One is a market price at or above where Foods would have made an accounting profit.[22] On Figure 4, this price is set at $P_{m3}$. Once again, this comparative study of the market price vis-à-vis the cost structure of Foods in pictorial form evidences that Foods was not paid a market price of $P_{m3}$ or higher. Once more, the basis of this conclusion is that Foods did not make a profit, this time an accounting profit. Had it, it would have been paid at least $P_{m3}$ or higher. Since it did not, the price received by Foods was below $P_{m3}$ during the trustee's complained of period for sales of product to Pizza and Cookie.

Yet another market price is one equal to that at which Foods would be indifferent to continued production, $P_{np}$. Again, this is a price covering the full amount of variable costs of production and none of the associated fixed costs. Put another way, $P_{np}$ is also the price at which Foods would be no worse off by stopping production

**22.** It is possible to modify the SRAC, SRAVC, and MC cost curves to reflect no implicit costs and thus represent only accounting costs. Assuming implicit cost is a positive number, this adjustment would shift each downward. Whether they may additionally shift to the left or right is another matter of far more complexity that does not change what may be done. After doing this, a comparison of what is shown by these graphs could be made between the accounting cost structure and that using economic costs by overlaying them. The overlay would show the location of a price at and above which Foods would make an accounting profit in relation to the economic cost structure of Foods. This Court has not done this for ease of discussion. Rather, a price, $P_{m3}$, has been selected as a price from and above which an accounting profit would be present. Depending on the amount of implicit costs, it is theoretically possible that an accounting profit could exist even when economic costs would dictate that one cease production. Stated another way, an accounting profit might exist under certain conditions when the market price is below $P_{np}$ where economic analysis calls for the business to cease operations. Pure competition theory precludes this from happening by its definitional structure of buyers and sellers having the required degree of instantaneous knowledge of what is occurring, here sustaining unsustainable economic losses. In the real world, such fluidity of knowledge is not always the case which by the economic definition makes such a market not purely competitive. Even if it were, what is being dealt with here is a contended action taken in violation of what market forces dictate should happen when looking at Foods as an entity separate and distinct from Cookie and Pizza. One must understand that the trustee's causes of action assume a legal separation of Foods from Cookie and Pizza. However, his expert treats them all as one and the same for valuation purposes while skirting the issues of why the trustee does not attempt to collapse them legally into one. If successful, one potential effect is to take back what Cookie and Pizza arguably obtained from Foods while leaving their creditors without recourse to Foods' estate's assets. This raises a question about whether bankruptcy and fraudulent transfer laws are intended for this type of application.

because shutting down production would result in no variable costs being incurred and leave Foods with the same fixed costs it would have had had it produced. Richard A. Bilas, *Microeconomic Theory* 162–63 (1967); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 246 (Valerie Ashton ed., 3d ed.1995); C.E. Ferguson, *Microeconomic Theory* 262–63 (Lloyd G. Reynolds ed., 3d ed.1972); Richard H. Leftwich, *The Price System and Resource Allocation* 164–65 (3d ed.1966); Edwin G. Dolan & David E. Lindsey, *Microeconomics* 178–79 (Rick Hammonds et al. eds., 7th ed.1994). In Figure 4, $P_{np}$ is equal to the market price of $P_{m4}$. What $P_{np}=P_{m4}$ reveals is this is a market price which sets the floor below which Foods should not produce in the short run. In conjunction with the other market prices considered, one is able to visualize from Figure 4 that there is a range of market prices which Foods could have been paid by Pizza and Cookie for which it made sense, economically, to continue its production. This range is from $P_{np}=P_{m4}$ to a price minimally below the accounting profit price of $P_{m3}$[23].

What price Foods actually received for its sales to Pizza and Cookie is still unknown. Similarly, the precise market price at the time of each purchase of products from Foods is not known. Despite this, the comparison between prices in an interval of market prices and how each price within and outside the range relates to Foods' costs and profitability or not demonstrates several significant factors. One is that even if Foods had been paid

the market price for the products it sold to Pizza and Cookie from $P_{np}$ to just below $P_{m3}$, it would still have suffered losses from both the accountant's and economist's stance. However, Foods' continued production in the short run would have either minimized its losses to less than it would have been by not producing—any price above $P_{np}$ to just below $P_{m3}$—or not increased its losses in the short run above that which would be incurred by producing at $P_{np}=P_{m4}$. As presented by this analysis, this, too, is true from both an accountant's and an economist's perspective. For this reason, being able to prove that Foods suffered an accounting loss, standing alone, does not in the evidentiary sense make it more or less probable that either a fraudulent transfer occurred in its 11 U.S.C. § 548(a)(1)(B)(i) (2004) sense or that any damages exist which are recoverable under 11 U.S.C. § 550(a) (2004) for a fraudulent transfer or the trustee's count three preference claims. Likewise, it is not utilizable to prove damages for the state law based conversion and conspiracy claims.

Indeed, the evidence of accounting losses as presented by the trustee's accountant is no more indicative of Foods having been paid at or above the market price as it is that Foods was paid below the market price. Likewise and had Foods made a profit in the short run, the same may be said for a price at which Foods made either an accounting profit, a normal profit, or an economic profit which is sometimes referred to as pure profit. *See* Rich-

---

**23.** In a period referenced by economists as long run, Foods' continued losses would result in just what happened: going out of business. However, an economic analysis demonstrating the same requirement that one know how the firm's cost structure and losses relate to market values/prices—that is losses being incurred while receiving value/price within the range of what is a reasonably

equivalent value/price or outside such a range—would reach the same result. It is for this reason not presented. Of importance when evaluating the Hart report is that no discussion or consideration is given by him to the short run and long rum implications of when and under what circumstances Foods would have continued to operate. It is a fatal omission.

ard A. Bilas, *Microeconomic Theory* 160–61 (1967); James M. Henderson & Richard E. Quandt, *Microeconomic Theory* 96–97 (Seymour E. Harris ed., 1958); Richard H. Leftwich, *The Price System and Resource Allocation* 168–69 (3d ed.1966); Edwin G. Dolan & David E. Lindsey, *Microeconomics* 142, 278–79 (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* 153 (1993).

With a possible short run exception not presented by the facts before the Court, which is why this discussion was necessitated, the existence of such profits or losses under Foods' cost structure, standing in isolation from the market structure determined price where Foods sold its output, is no more probative of one having paid a reasonably equivalent value price than it is of one which is less than a reasonably equivalent value price.[24] The reason put verbally is that the accounting methodology of the Consumption Theory does not demonstrate indirectly what were the market values/prices of Foods' products sold for purposes of fixing the range for reasonably equivalent value and how accounting losses relate to this range, that is

whether Foods should have continued production or not in the short run.

It is of no import that this testing of the Consumption Theory does not establish a dollar amount for the market price or the exact dollar price spectrum at or above which Foods would produce while incurring a loss in the short run. The same is true for the fact that this testing does not prove that Foods should or should not have continued to operate rather than shut down production. The primary focus of the analysis is to test the assumption of a universal principle or generalization that accounting losses or profits prove for evidence admissibility purposes payment of less than reasonably equivalent value. Without quantifying in dollars and numbered units, this microeconomic model dispatches as not admissible the Consumption Theory formulated by the trustee by eliciting the fact that Foods may have been paid the market value or market price for its production and still suffered losses which caused the "cash assets" to diminish between December 31, 1995 and June of 1996.[25]

---

**24.** The potential exception is producing below $P_{np}$. One instance where having the specific pricing of Foods' outputs may not be needed is one involving a requirements contract for Foods' goods and the price paid Foods is below $P_{np}$. Since at such a price, shown as $P_{m5}$ on Figure 4, Foods would not produce, shown on Figure 4 as $Q_5$ located at 0, it may be that a showing of a short run economic loss greater than the losses which would have been incurred by shutting down are sufficient indirect evidence to be both relevant and admissible. An even stronger case may be production at a price below one where both an economic loss and an accounting loss occur. Without such evidence, this Court need not (i) undertake the further analysis, or testing, to ascertain whether continued production and sales at such a price or prices demonstrates something untoward in the economic sense sufficient to indirectly show a constructively fraudulent transfer and (ii) decide the relevancy and admissibility of such indirect evidence.

It is enough to keep in mind that such evidence may in a proper case demonstrate what Mr. Hart's testimony and report do not. *See also supra* n. 22.

**25.** This Court has cited to economic texts and treatises written with varying degrees of complexity and difficulty. Those which are more basic and easier to understand are Edwin G. Dolan & David E. Lindsey, *Microeconomics* (Rick Hammonds et al. eds., 7th ed.1994); Alan Hochstein, *Microeconomics* (1993); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* (Valerie Ashton ed., 3d ed.1995); and Robert Cooter & Thomas Ulen, *Law & Economics* (Andrea Shaw & Debra Lally eds., 3d ed.2000). One presenting the subject in a medium degree of complexity and difficulty is Richard H. Leftwich, *The Price System and Resource Allocation* (3d ed.1966). Some of the harder to comprehend are George J. Stigler, *The Theory of Price* (3d

It also illuminates that the existence of an accounting loss in Foods' trustee's accountant's presentation must be coupled with evidence of the relationship of that loss generated under the seller's, Foods', cost structure, to the market price for the products sold. Here the trustee's desired accounting testimony and report are devoid of this information and comparison. Without presenting information of a relationship indicating, at the minimum, something outside the perimeters of usual market behavior, the accounting information does not make it less likely that Foods was paid less than reasonably equivalent value any more than it makes it more likely to have occurred. Having no predictive ability to indicate a greater or lesser probability, this portion of the testimony and report of Mr. Hart are irrelevant and inadmissible. *U.S. v. Hands*, 184 F.3d 1322, 1326 (11th Cir.1999) (stating "evidence was inadmissible because it was irrelevant"); *Copeland v. Gulf Oil Corp.*, 672 F.2d 867 (11th Cir.1982); Fed.R.Evid. 402, 702.

### (4) The Non–Expert and Market Distortion.

More importantly, the outcome achieved by this analytical format manifests a further limitation on use of the trustee's witness and his report. As is far too often the case with accountants and others utilized as experts, they opine on topics for which no specialized knowledge or training is possessed. Under the shroud of accountancy, this sometimes happens by mimicking that which only a person with proper training and knowledge in another discipline would be able to comprehend including the ramifications of this other type of specialized knowledge. Other times, such as in this Foods case, it is done by an accountant packaging the factual issues in the guised wrapping of accounting when, in reality, they are in significant part or in the whole another subject matter beyond the expertise of accountancy. Here, the critical knowledge is not only what is devised by mechanistic and arithmetic functions employed under accounting rules for how to categorize things such as income, expenses, and so forth. Rather, it is the interrelationships between market structures, including market pricing for Foods' products, and Foods' cost structure. Such a comparison necessitates a kind and quality of knowledge beyond that demonstrated by Mr. Hart and by accounting credentials. Neither Mr. Hart's testimony nor his report envisage this necessary comparison and both show a lack of knowledge regarding market structure and pricing. Accountancy experience may be a part of the specialized knowledge which is necessary to prove the trustee's case, but it is not all of what is sufficient. The outcome is that Mr. Hart is not an expert witness for all of the purposes for which the trustee desires to utilize his Consumption Theory testimony and report. This, too, means that the report and Mr. Hart's proposed testimony are not admissible.

A broader review reveals a greater problem with the Consumption Theory and what the trustee has sought to do. Any argument predicated on proving a constructively fraudulent transfer by a showing of only an accounting loss has an impact not contemplated as part of fraudulent transfer law for bankruptcy purposes.

ed.1966)(excluding Appendix A, Fundamental Quantitative Relationships, and Appendix B, Mathematical Notes); Richard A. Bilas, *Microeconomic Theory* (1967); and C.E. Ferguson, *Microeconomic Theory* (Lloyd G. Reynolds ed., 3d ed.1972). The one requiring a degree of understanding of quantitative methods and mathematics is James M. Henderson & Richard E. Quandt, *Microeconomic Theory* (Seymour E. Harris ed., 1958). For many, it may be too complex and difficult. The same is true for Appendix A and Appendix B to the Stigler text.

It potentially transforms all requirements contracts to or by a subsequently bankrupt entity or person into the subject matter of a fraudulent transfer claim merely by producing evidence of an accounting loss. The consequence is that under the trustee's theory anyone doing a certain level of business with a person or entity operating at a loss could face a constructive fraud claim. There is no legislative history or case law support for a claim premised on such a generalized proposition using only accounting losses to show a constructively fraudulent transfer under 11 U.S.C § 548(a)(1)(B)(i) and as the recovery measure of 11 U.S.C. § 550(a). *See* H.R.Rep. No. 97–420 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583; H.R.Rep. No. 99–764 (1986) *and* H.R. Conf. Rep. No. 99–958 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227, 5246; H.R.Rep. No. 101–484 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223; H.R.Rep. No. 103–835 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340. Any different scope for what is a constructively fraudulent transfer would be a factor causing a further adjustment in the mechanism determining the market set price and market set quantity which would otherwise exist under the correct scope of application of constructively fraudulent transfer law.[26]

## B. Assisting the Trier of Fact and The Other *Daubert* Factors.

### (1) Testing's Other Impacts.

So far, the Court's evaluation has been based on an assumption that various aspects of the accounting foundation on which the Consumption Theory rests are correct. When this assumption is relaxed and the underlying methods of Mr. Hart are scrutinized, fundamental flaws in these portions of what he did are revealed. As the microeconomic testing of this theory demonstrates, Foods could have been selling its outputs at and above what would be 11 U.S.C. § 548(a)(1)(B)(i)'s reasonably equivalent value and still have incurred net losses. Still, Foods could have legitimately continued its operations to reduce losses to below those it would have faced had it simply ceased all business operations. This would have entailed ongoing losses in 1996 which would have depleted Foods' assets to levels below those existing as of December 31, 1995. Mr. Hart did not consider whether, and if some, the impact of such loss minimization activities on any assets, including his definition of "cash assets," as reflected on the internal accounting records of Foods as of the end of 1995.

Equally important as this problem with the Consumption Theory's lineage is the absence of evidence presented to demonstrate that it is a valid way to show a constructively fraudulent ' transfer and damages recoverable for such activities, a preference under 11 U.S.C. § 547(b), conversion, and conspiracy. Despite disagreement over much of what is asserted by the trustee, both sides to the disputes agree on one trait of the Consumption Theory. The trustee's vouching accountant for Hart,

---

**26.** Again, this is subject to the potential exception mentioned in footnote 24 and alluded to in footnote 22. As an adjunct to this, one must know that the bankruptcy laws operate, potentially positively or negatively, as a constraint on what would otherwise happen in the market place. As a result of knowledge of bankruptcy laws in the marketplace, the supply and demand for a product along with its price could vary from what each would be absent such laws. This is why the Court indicates a further adjustment to the market price and market quantity set amounts may result from the acceptance of the Consumption Theory as fashioned by the trustee's representatives. The phenomenon is not restrict to use of accounting losses. A like occurrence could take place involving a buyer of goods under a requirements contract under an application of accounting profits as a proxy for the reasonably equivalent value measure.

Ralph Summerford, and the Andrews/Bush/Winston Defendant's controverting accounting, Mr. Pearce, have never previously encountered it.

Just because a methodology is being used for the first time is the reason for exclusion standing without either (i) other support, such as empirical unsoundness or (ii) a legally accepted policy based premise for excluding evidence even when it is an empirically sound, non-universal generalization, *see, e.g.*, Frederick Schauer, *Profiles, Probabilities, and Stereotypes,* Harvard University Press 136–54, 177–89, 195–96, 208–15 (2003), should not always be used as barring it from being admissible evidence. For under the generalization of "first time usage," such a rule would exclude evidence which may be tested to show that it is empirically or otherwise sound, that is reliable and legally relevant to the issues at hand.[27] However here, testing proves the opposite and supports application of the *Daubert-Kumho* guidance that it should be excluded when not known by other experts, not having been the subject of peer review, and not having gained acceptance in the specialized knowledge community. See *Allison v. McGhan Medical Corporation,* 184 F.3d 1300, 1309–18 (11th Cir.1999).

### (2) Yet More for Exclusion— Underlying Bookkeeping Unreliability

Testing by economic modeling has elicited the fact that the Consumption Theory under the trustee's accountant's formulation is unreliable in its overall predictive sense that loss of monies may indirectly prove a constructively fraudulent transfer and damages arising from such a transfer.

There is one more, different reason why the Consumption Theory is unreliable. It rests on the Hart assumption that the internal records of Foods are accurate. The evidence is to the contrary. First, the Andrews/Bush/Winston Defendants purchased interests in Foods premised on incorrect books and records: the supposed loss was far greater than presented to them for 1994. There was an error in the magnitude of over $1,900,000.00. Although some of this was from an incorrect estimate of the earnings for the balance of the year, the residual amount represents errors in Foods' books of account.

Next, the internal accounting records of Foods' inventory on December 31, 1995 show it as $1,163,488.00 and the inventory for the end of January, 1996 was fixed at $507,035.00. The difference, $656,413.00, is greater than the amount of sales by Foods in January, 1996. The gross sales number was $465,340.00. This leaves $191,073.00 unaccounted for by the decline in inventory and its possible usage in production for sales during January, 1996. It may be all or in part the result of losses from the sales of Foods' products. However, this may not be the case. Since Mr. Hart failed to take into account a 1996 adjustment to retained earnings of $297,120.00 for the calendar year 1995, another reason or reasons may explain some or all of the inventory decline. One may be that the downward change in retained earnings was the result, at least in part, of an adjustment correcting an overstatement of inventory as of December 31, 1995. That this is the case is supported by external accounting records prepared for Foods for the year ending December 31, 1995 by the accounting firm of Melosh &

---

**27.** It may be argued that the *Daubert-Kumho* rulings establish a "first time usage" rule to exclude all such specialized, technical, and scientific evidence on a policy founded on the idea that it is better to exclude such evidence for the sake of avoiding over usage of a generalization until such time as sufficient testing by others ensures its reliability. This, however, is not the case with the trustee's accountant's theories.

Associates of Zanesville, Ohio which show the aggregate value of all inventories as $624,099.00, not anywhere near the internal number as of the end of 1995 of $1,163,488.00.[28] Mr. Hart's testimony and report do not reflect that the accuracy of inventory set forth on the internal accounting records of Foods was verified or that any of the other information regarding "cash asset" values in the internal books and records of Foods was examined for accuracy. This is despite a variation in inventory unexplained by Hart of over $500,000.00 and a sum which, depending on the measure, is from about twenty to twenty-five percent of the claimed damages. The reality revealed by his deposition testimony is that he assumed the accuracy of the internally kept numbers in the face of clear indications of their inaccuracy. Hart Depo. 58–59.

In a similar vein, the Hart report and his proposed testimony do not reflect any review having been made of whether in 1996 "cash assets" were used to pay down the level of certain debts and liabilities which existed at the end of December, 1995. Such an analysis should have been part of what Mr. Hart did. It would have ensured that his so-called "cash assets" reduction comparison from Foods' internally kept records as of December 31, 1995 versus the June, 1996 bankruptcy petition numbers was not the result of using some of these "cash assets" to reduce debts and liabilities which would otherwise have existed as of Foods' bankruptcy filing. Once again while being deposed, Hart stated he did not consider the effect on the Consumption Theory should accounts payable

be below what they were on December 31, 1995. Hart Depo. 425.

Likewise, there is no information indicating Mr. Hart took into account whether the internal bookkeeping records' asset and liability valuations as of December 31, 1995 were determined using the same accounting methods as those used to set the valuations for the same assets and liabilities on Foods' bankruptcy schedules. Yet, he admits he knows that what are bunched as "cash assets" from the internal accounting record of Foods do not correspond to what are grouped as unsecured, nonpriority claims in Foods' bankruptcy schedules. Hart Depo. 246, 426. Ever more, the $1,038,838.26 value attributed by the trustee to the settlement with H & M for the bad pepperoni purchased by Foods' for some of its 1995 pizza production is not built into the theories employed by Mr. Hart and his report. This amount is almost half of the damages sought and when taken together with the inventory discrepancy these total from two-thirds to up to three quarters of what the trustee seeks.

These factors evince the fact that the accounting portion of Mr. Hart's Consumption Theory is founded on both unreliable records and accounting. It also means that the accounting portion of what is necessary to allow use of the Consumption Theory is flawed. The added problem with this part of the Hart report and testimony is that the segment for which Mr. Hart may have been an expert, accounting, is also inadmissible. Thus, the other necessary, but not sufficient, aspect of what is required for admission of the Hart report and testimony is not present.[29]

---

28. The numbers in Melosh & Associates' report for all inventories aggregate $624,099.00. In one or more of the briefs and memoranda, it is incorrectly fixed at $626,099.00.

29. Absent more detailed consideration of the accuracy of Foods' records, the over $500,000.00 inventory valuation variance added to a $750,000.00 royalty receivable reflected in the Hart methods—which in reality was the cap on royalties payable by Delicom

## VI. Bennu, a Heron, Does Not a Phoenix Make: The Ascribed Value Theory.

### A. Parentage and Why the Adjustment?

■ The other parts of Mr. Hart's testimony and report deal with what has been denominated the Ascribed Value Theory. It, too, has been formulated with flaws in accounting, unconsidered—yet assumed—economics, and improper application of valuation techniques to what is being valued. It is evident that Mr. Hart recognized that the Consumption Theory's concept for proving less than reasonably equivalent value and damages by comparing "cash assets" at two different points in time does not deal with what happened to the other properties of Foods. This is explicitly expressed in his report. If one recalls that the Consumption Theory is premised on the consuming of Foods' properties by selling its pizza, cookie, and fundraising products, there is a void in its formulation: it does not deal with what happened to non-cash assets or properties. Thus, the trustee's accountant seeks to obfuscate this inherent failure in the Consumption Theory's formulation and avoid addressing whether any of these so-called "cash assets" were used to reduce items such as long term debt, rents, and other liabilities which may have been greater than they otherwise would have been.[30],[31] Undoubt-

to Cookie for which less than $3,000.00 was received by Foods—plus the $1,000,038.00 H & M settlement value for tainted pepperoni having allegedly destroyed Foods' business sums to $2,288,000.00. This amount virtually matches the trustee's claimed damages to Foods under the Consumption Theory. If a January, 1996 loss of about $400,000.00 is not a part of the reason for the argued inventory decline under the Consumption Theory, this added to the $2,288,000.00 or $2,688,000.00 exceeds all of what the trustee wants to recover. All the while, should these be the sources of the losses in value, none is recoverable by the trustee under the various causes of action set forth in his pleadings.

**30.** Mr. Hart's report does reflect that he looked at what happened to trade payables. However, the comparison stopped there. He does not demonstrate consideration of where the "cash assets" may have also been applied. Furthermore, his report on what happened to trade payables is that "[t]he debtor's trade liabilities were not similarly reduced, but actually increased during this same period." His predicate for this assertion is a comparison of "reported accounts payable" as of December 31, 1995 versus "unsecured nonpriority claims" as of June 3, 1996. When any accounting student should know that accounts payable is less inclusive than bankruptcy scheduled unsecured nonpriority claims, it is hard to fathom that a so-called expert could believe that this Court would be deceived by such a verbal slight of hand.

Likewise, the report has other, equally egregious deceptions. Just for example purposes, Mr. Hart talks about the sale of Foods' cookie business to Cookie on December 1, 1995 for $150,000.00 and "[s]ix months later 'Cookies'...transfer of those same assets to Deli–Com Foods, Inc. for $725,000.00." What he does not mention is that the sale was for a small cash sum, $30,605.26 for inventory, and the right to receive a royalty payment which in the aggregate over time could not exceed $725,000.00. There was no minimum royalty payment. It was only capped. Even if one overlooks the added factor that only $2,705.92 was paid to Cookie in royalties, the contention that these assets were sold for $725,000.00 in presently valued dollars as of the date of sale and that this is the sale price is more than imprecise. This Court can only conclude that the so-called expert and, maybe others, believed that the chiaroscuro lineage of the liability and damage proof hidden in the pogonip created by mounds of papers, interminable, meandering pleadings, memoranda, and motions, and tortuous hours of testimony would chill this court's efforts to try to make sense of it all.

**31.** The trustee's representatives understand this problem. To counteract it, two affidavits have been submitted. One is from Lester Nuby. Mr. Nuby was chairman of the board of directors and chief executive officer of Foods until September 20, 1995, when he was fired from both positions. Despite this former di-

edly, this is one reason for the development of the Ascribed Value Theory as the supplement for the Consumption Theory for proof of both less than reasonably equivalent value under 11 U.S.C. § 548(a)(1)(B)(i) and damages of the sort recoverable under 11 U.S.C. § 550(a). Just as with the Consumption Theory, the Ascribed Value Theory is also the trustee's damage measure for the count three preference, the conversion, the conspiracy, and the 11 U.S.C. § 548(a)(1)(A) actual fraud claims.

■ Similar to the Consumption Theory, the Ascribed Value Theory tries to prove indirectly that which is usually demonstrated by directly. As indicated, the usual means of proof is direct evidence for the liability part of the equation by ascertaining the market value of property transferred from Foods to another and comparing this value with what Foods received in return. Any difference between what Foods received and what is its market value, if greater than what was received by Foods, is proof of part of that which is necessary for a liability determination under 11 U.S.C. § 548(a)(1)(B)(i). Under section 550(a), that allowing for a recovery for a fraudulent transfer and a preference, the trustee has two options. In pertinent, this section contains:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 547, 548, ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, ....

11 U.S.C. § 550(a). Although the language of § 550(a) sets forth that the recovery may be "the value of such property," the case law interpretation of this provision limits what the trustee may recover to

rector/officer status, his affidavit is filled with factual assertions and legal conclusion premised on fact contentions for the post-September 20, 1995 period. Included in this is his professed personal knowledge that "[t]hey are basically the same liabilities in the same aggregate amount as was owed on or about September 20, 1995, and none of the value of the cash or cash equivalent assets of Perry County Foods was used during the period of time [September 20, 1995 through June 3, 1996] for the retirement of ... debt." The problem with the Nuby affidavit is that this portion is inadmissible. The reason is that all of his so-called "personal knowledge" for this statement is, at best, based on hearsay. In what is certainly an oversight by the trustee's representatives, Nuby contradicts the trustee's pleadings and memorandums in all of which are contentions that so-called critical vendors had their debts paid down to ensure they would continue to do business with one or more of Foods, Pizza, and Cookie and with how certain retailers were paid slotting fees. It, also, is the opposite of Hart's report's "Supporting Point 1" and "Supporting Point 2." Furthermore, Nuby does not differentiate between "cash assets" as defined by Hart, what they were on December 31, 1995 in Foods' internal accounting records, and the fact that the bankruptcy schedule categorizes liabilities differently from both Hart's "cash assets" and the internal accounting records' classifications. Other portions of the Nuby affidavit are equally lacking in evidentiary substance because of hearsay, lack of a proper foundational predicate, *see, e.g., Bruce Construction Corp. v. United States*, 242 F.2d 873, 876–78 (5th Cir.1957), not being best evidence, legal conclusions, and on and on for deficiencies requiring its exclusion from evidence for most of what it contains.

The second affidavit is that of David H. Dees, another CPA used by the trustee as the bankruptcy estate's general accountant. His affidavit compares internal accounting records of Foods for accounts payable, accrued expenses, and a cash overdraft aggregating $2,788,318.00 versus the $3,107,170.00 total of unsecured priority and unsecured nonpriority liabilities scheduled in Foods' bankruptcy. As with Mr. Hart and Mr. Nuby, he fails to discern and does not reflect investigation into the fact that these two aggregates are not identical in what they contain. Thus, his assertion of "no net reduction in related debts" is of no evidentiary value from the law's perspective.

the property's value less any consideration received by the debtor for the property transferred. *In re Colonial Realty Co.,* 226 B.R. 513, 525 (Bankr.D.Conn. 1998)("Courts generally agree that the market value of the property . . ., less the consideration received, is the proper measure of recovery under § 550."). *See In re Integra Realty Resources, Inc.,* 354 F.3d 1246 (10th Cir.2004); *In re Maddalena,* 176 B.R. 551 (Bankr.C.D.Cal.1995). *See also Matter of Kaczorowski,* 87 B.R. 1 (Bankr.D.Conn.1988) *and In re Shape, Inc.,* 176 B.R. 1 (Bankr.D.Me.1994).[32] Since the trustee does not seek return of the property transferred, no consideration will be given to this form of recovery in the context of evaluating the admissibility of the of Mr. Hart's testimony and report.

## B. One and the Same: Consuming and Ascribing.

Without giving more than a minimal degree of thought to what the trustee's accountant is attempting to do with the Ascribed Value Theory, one would not of necessity realize that it has the Consumption Theory as a significant portion of its inherent composition. That this is the case is revealed by close scrutiny of Hart's report and a dispute set forth in the various memoranda of the trustee and the Andrews/Bush/Winston Defendants. Of the six points given by Mr. Hart as support for the Ascribed Value Theory's valuation, "Supporting Point 1," "Supporting Point 2," and "Supporting Point 3" are merely restatements of smaller segments of "Supporting Point 6" which is the "cash assets" consumption point. So too, for "Supporting Point 3" which partly encompasses the consumption of assets and "Supporting Point 5" which in significant part incorporates what is the consumption theorem of "Supporting Point 6." As for the battling of the memorandums, the Andrews/Bush/Winston Defendants argue that section 550 of the Bankruptcy Code limits the trustee's recovery to either the items transferred or their value. Furthermore, they argue that all that was transferred for § 550(a)'s purposes were two licenses. The Andrews/Bush/Winston Defendants continue that, assuming a fraudulent transfer occurred, the scope of recovery is the value of each license and the trustee's Ascribed Value Theory does not measure the value of either of the licenses. Rather, it projects entry valuations of Pizza and Cookie which were premised on investments to be made by the Abela Group in Pizza and the Chart Group in Pizza and Cookie along with assumptions regarding future revenues, expenses, and profits. The Andrews/Bush/Winston Defendants are correct in their description of how the Ascribed Value Theory extrapolates a value for Foods. They are wrong in the characterization of how the trustee's accountant tries to do this with the Ascribed Value Theory.

What Mr. Hart does is take the entry level valuations for Pizza and Cookie from the Terre Nova Memorandum which he reads as fixing a seventy percent interest in Pizza at $1,300,000.00 and that for Cookie at $500,000.00. He then respectively divides each of these numbers by the supposed ownership interest of Winston Capital in each. Here, Pizza's one hundred percent ownership valuation becomes $1,857,143.00 and Cookie's $714,285.00. The premise for doing this is that all of the value of Pizza and Cookie was derived wholly from the transfers of properties of

---

**32.** In *In re Integra Realty Resources, Inc.,* 354 F.3d 1246 (10th Cir.2004), the United States Court of Appeals for the Tenth Circuit's panel opinion contains an expression of a disagreement with the point in time for valuation of the property that was selected by the *Colonial Realty* court, 226 B.R. 513. This Court does not address this issue in this case.

Foods to Pizza and Cookie. The Andrews/Bush/Winston Defendants concede the sale of the licenses. However and with the possible exception of *de minimus* other transfers, there is nothing referenced by the trustee or his expert to justify the extent of the trustee's accountant's valuation of what Pizza and Cookie received from Foods other than the continued production and sale of the pizza, fundraising, and cookie products "consumed" the assets and properties of Foods. Recognition of this factor reveals that the Ascribed Value Theory, with some additions, is nothing more than an another method for valuing that which the trustee's accountant attempts to do under the Consumption Theory and that it incorporates the Consumption Theory's consumption postulate. This is also the primary basis on which Mr. Hart predicates his valuation of what was transferred at less than market values: the gist of "Supporting Point 6" of his report is that of the total valuation of $2,571,428.00 of what are the claimed damages, $2,179,516.00 was consumed.

Since this Court has already utilized microeconomic theory to show that the Consumption Theory as implemented by Mr. Hart does not come within the confines of Rules 402 and 702 of the Federal Rules of Evidence as admissible expert evidence, the identical microeconomic analysis undercuts use of the Ascribed Value Theory because its structure builds in consumption of Foods' properties by sales of pizza, cookie, and fundraising items for allegedly less than reasonably equivalent value. It also precludes its use to prove a recovery under 11 U.S.C. § 550(a) for any constructively fraudulent transfer and damages for the other contended causes of action for an actual fraudulent transfer under 11 U.S.C. § 548(a)(1)(A), the count three preference, the conversion, and the conspiracy claims.

## C. Asset Valuation and Stream of Revenue Values of Ownership Interests—Not Always the Same.

When the trustee's accountant uses the Terre Nova Memorandum entry valuations for Pizza and Cookie, he is not using a valuation of assets of Foods or Pizza or Cookie. What he has focused on are the Terre Nova Memorandum valuations of the ownership interests of Pizza and Cookie. These are then arithmetically extrapolated to supposedly find the value of Foods transferred to Pizza and Cookie as being equal to one hundred percent of the entry valuations for the ownership interests of Pizza and Cookie.

Other than stating that all that Pizza and Cookie had came from Foods, the trustee's accountant's testimony and report do not delineate why such equity interest valuations correspond with the value of what was transferred from Foods to Pizza and Cookie in 1996. Indeed, there is no reference to the fact that the Terre Nova Memorandum values were predicated on a $500,000.00 cash infusion into Pizza by the Abela Group for a twenty five percent interest in Pizza and how the Chart Group proposed $2,000,000.00 purchase monies were utilized for purposes of calculating the entry valuations for Pizza and Cookie. These are ignored. Also neglected is that the Abela Group purchase of an ownership interest in Pizza never occurred. So too, is the fact that the Chart Group rescinded what was in reality a conditional offer to purchase a portion of Pizza and Cookie. These factors also prevent the Ascribed Value Theory from being admissible under the Federal Rules of Evidence. The why is that underlying suppositions of the entry valuations never occurred making the Terre Nova Memorandum valuations unreliable and irrelevant in both their legal and real world usages.

## D. Valuation an Offer is Not.

 Following on the fact that the Terre Nova Memorandum is akin to an unconsummated offer to purchase or sell is the evidence case law. Because the failed sale of the interests of Pizza and Cookie by the Andrews/Bush/Winston Defendants rests on agreement conditions not being met, it is no different than an arrested sale of any property at an offering price, be it real estate, stocks, bonds, or whatnot. The consistent, long standing legal determinations that evidence of offering prices is inadmissible has legal application to this trustee-Andrews/Bush/Winston Defendants–Edelbrock–Chaffee matter. *Sharp v. U.S.*, 191 U.S. 341, 348–49, 24 S.Ct. 114, 115, 48 L.Ed. 211 (1903) (stating that an offer "is of a nature entirely too uncertain, shadowy, and speculative to form any solid foundation for determining the value ...."); *U.S. v. 0.59 Acres of Land*, 109 F.3d 1493, 1496 (9th Cir.1997) (stating "... a letter containing a mere offer to buy 'comparable' property [was] plainly inadmissible"); *U.S. v. 10,031.98 Acres of Land*, 850 F.2d 634, 637 (10th Cir.1988) ("It has long been held in condemnation suits that the offering price of replacement properties cannot be used to show the fair market value of condemned land."); *U.S. v. 158.24 Acres of Land, More or Less, Situate in Ashley, Bradley and Union Counties, State of Ark.*, 696 F.2d 559, 565 (8th Cir.1982) ("An offer to sell may not be considered as evidence of fair market value ...."); *Washington Metro. Area Transit Auth. v. One Parcel of Land in Montgomery County, Md.*, 548 F.2d 1130, 1131 (4th Cir.1977) (holding "... a landowner who rejects a pre-condemnation offer ... may not introduce that offer as proof of value ...."); *U.S. v. Smith*, 355 F.2d 807, 811 (5th Cir.1966) ("It is well settled that a mere offer, unaccepted, to buy or sell is inadmissible to establish market value."); *Missouri Baptist Hosp. v. U.S.*, 213 Ct.Cl. 505, 555 F.2d 290, 298 (1977) (holding a letter from an agent stating that his client "may still be interested in offering $500,000 all cash ..." to be "inadmissible to determine fair market value" and therefore was "improperly admitted" by the trial judge). The product is that this case law application of the generalizations called rules of evidence estops use of the Ascribed Value Theory and its inclusion within the subset of admissible evidence.

## E. No Expert, No Daubertian Compliance.

Moreover, the added implication from all of this is that once more the trustee desires to use an accountant to place into the subset of admissible evidence matters for which he does not have the requisite training and expertise. In the case of the Ascribed Value Theory and since it includes within what is being attempted that which the Consumption Theory tries, what is lacking in expertise is one of the areas which is a necessary condition for demonstrating its reliability and relevance as these terms are used in *Daubert, Kumho*, and their successor case law applications: economics. *See* discussion *supra* Parts IV. A(2)-(4), IV.B. The other necessary condition is the accounting portion of what makes up sufficiency for admissibility. In this arena, also, Mr. Hart's testimony and report are deficient. The accounting analysis is deficient and, more devastatingly for the trustee's causes of action, rests on a methodology designed to meet the needs of the occasion rather than on what *Daubert–Kumho* in conjunction with Federal Rules of Evidence 402 and 702 instruct, which is a reliable theory or technique tested, subjected to peer review and publication, and having gained a degree of acceptance within the relevant scientific, technical, or other specialized knowledge community. The result for the Ascribed

Value Theory is the same as that for the Consumption Theory. This portion of the Hart report and testimony are excluded from use at trial.

### VII. The Source Unearthed and Why Arrogation of Consumption and Ascription Does Not Create Specialized Knowledge.

Perhaps what is the most telling reason supporting why the Hart report and his testimony on its contents are inadmissible is revealed by the deposition colloquy between Mr. Hart and counsel for some of the defendants. At one point, this occurred:

Q. Who came up with the idea of the assets consumed approach; was that [counsel for the trustee]?

A. Yes.

Q. Did you ever—

A. When you say came up with that approach, I would say that is his theory in the case.

Hart Depo. 101.

At another time during the same deposition, Mr. Hart responds to why he did not value the items that were licensed. The discussion is:

A. And I have not made a specific appraisal of those values.

Q. Why not?

A. Based upon my engagement, I did not believe that that was a necessary ingredient to produce my report.

Q. Why not?

A. [Counsel for the trustee's] theory of legal recovery in this case did not depend on that.

Hart Depo. 171.

What this establishes is that the consumption methodology and the Ascribed Value Theory by incorporation of the Con-

sumption Theory are not specialized approaches, here accounting, which in the *Daubert–Kumho* phraseology have gained any degree of acceptance within the accounting community. This is due to the fact that each has been devised by one without specialized knowledge in accounting and economics. As such, the Hart report and his proposed testimony are not part of Federal Rule of Evidence 702's reach because neither is within what is "expert" in its Rule 702 usage.

### VIII. The Eventuation, Terminal or Not.

#### A. More Evidence or None and Outcomes.

■ This Court's determination that the Consumption Theory and Ascribed Value Theory portions of the Hart report and his testimony on these theories are excluded from evidence has the effect of excluding all of Mr. Hart's report and testimony as currently formulated. This leaves the trustee without sufficient admissible evidence for the part of the liability equation specifying the requisite demonstration of receipt of less than reasonably equivalent value for sustaining a cause of action for a constructively fraudulent transfer under § 548(a)(1)(B)(i) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(B)(i) (2004). It correspondingly removes the trustee's desired proof for a recovery under 11 U.S.C. § 550(a) for all of the asserted 11 U.S.C. § 548(a) fraudulent transfer claims, actual and constructive, the count three preference claims, along with damages for the asserted conversions and conspiracy.

The impediment now faced by the trustee is that he does not have admissible evidence to demonstrate a recoverable sum, damages, from the defendants for

any of these causes of action.[33] The mediate consequence of this is that his primary claims in terms of dollar value are wanting for admissible evidence of the character and quality needed to maintain to judgment the fraudulent transfer, count three preference, conversion, and conspiracy causes of action. Ultimately and should the trustee not have other evidence of damages of the legally cognizable kind, the fraudulent transfer, count three preference, conversion, and conspiracy causes of action become unsustainable to judgment. If the trustee possesses no replacement evidence which would enable him in phoenix-like fashion to rejuvenate these causes of action, what is the heart of this case will follow the path of Foods to its worldly end without hope of being salvaged from its ashen state.[34]

### B. Comparisons and More: Myths, Generalizations Particular and Otherwise, and Pictures too!

Although the analogy of the businesses of Foods to the life cycle of the phoenix has been made, it should not be misconstrued as an engaging tactic to maintain one's attention over a prolonged discussion of what is not right with the nonuniversal generalizations regarding accounting losses proposed by the trustee of Foods. It has greater purposes. One is to evoke an understanding that particularism, that is a more individualized, application of laws sought by some, is similar to the allegory that but one phoenix existed and could receive attention at any given moment. This is coupled with the realization from magnification by investigation that the particularized treatment cited by some as a better application of the law is in reality based on generalizations just as are those rules and laws criticized by particularists as being mere generalizations. Frederick Schauer, *Profiles, Probabilities, and Stereotypes,* Harvard University Press 55–78 (2003).

The closing is that a pictorial representation of a story such as that done by

---

**33.** There are other difficulties with the trustee's claims. One is with the conversion assertions as they relate to those of a constructively fraudulent transfer. Since bankruptcy law does not include within the elements of a constructively fraudulent transfer those mandated for proof of conversion, i.e., a wrongful taking, wrongful retention, or misapplication of property, *compare* 11 U.S.C. § 548(a)(1)(B) *with Cassels v. Pal,* 791 So.2d 947 (Ala.2001), *Huntsville Golf Development, Inc. v. Ratcliff,* 646 So.2d 1334 (Ala.1994), *Gillis v. Benefit Trust Life Insurance Co.,* 601 So.2d 951 (Ala. 1992), *Rainey v. Ford Motor Credit Co.,* 294 Ala. 139, 313 So.2d 179 (1975), *Automotive Acceptance Corp. v. Powell,* 45 Ala.App. 596, 234 So.2d 593 (1970), *Harmon v. Dothan Nat'l Bank,* 186 Ala. 360, 64 So. 621 (1914) *and French v. Bank One, Lima N.A.,* 238 B.R. 363 (Bankr.N.D.Ohio 1999), *Coleman v. Fishhead Records, Inc.,* 143 Ohio App.3d 537, 758 N.E.2d 694 (2001), *Braucher v. Mariemont Auto,* 2002 WL 1393570 (Ohio Ct.App.2002), use of proof of a constructively fraudulent transfer as the evidence of a conversion under either Alabama or Ohio law—which law is another factor not addressed by the trustee— would be insufficient to prove such a claim.

**34.** In connection with multiple motions for summary judgment by various of the defendants, this Court could grant summary judgment in favor of the defendants on the fraudulent transfer, count three preference, conversion, and conspiracy claims. This is despite the fact that no defendant bases a request for summary judgment on the reasons articulated in this memorandum opinion. *See, e.g., Massey v. Congress Life Ins. Co.,* 116 F.3d 1414, 1417 (11th Cir.1997) (stating "courts unquestionably possess the power to trigger summary judgment on their own initiative."). Instead, a status conference is to be held to determine whether the trustee has other admissible evidence to overcome his current predicament of inability to prove these causes of action. For the interim, the various defendants' motions for summary judgment will be deemed moot until after the status conference, these motions may or may not need to be considered again.

hieroglyphics may reflect recognition of a better means of manipulating ideas and their variations than accorded by words which are made inherently imprecise through the limitations of the mind's verbal and pictorial abilities without the aid of those technical, scientific, and quantitative means which have been waiting for greater synthesis into the law and judging. Here it is the pictures of the mathematics, graphs, depicting economic theory joined with the other analytical devises available. Not having the full panoply of such information applied to legal issues is a cause for the fact that generalizations abound in particularism as well as why generalizations inherent in both decision making philosophies make each less accurate for dispute resolutions than they might be otherwise. Enhanced knowledge of things technical, scientific, and quantitative may narrow the distance between the two approaches' views on how each interprets and applies laws to dispute resolution.

Without question when it is understood that a graph sometimes eliminates discontinuities, deviations, and similar things from what is pictured or that the underlying mathematics are based on assumptions which may be generalizations, the nature of graphs as pictures is that they frequently generalize. Knowing this leads to a realization that particularism and generalization are at least partially overlapping subsets making the greater whole for what is conceived by two camps for how to decide legal disputes.

Possession of knowledge more technical and quantitative by Perry County Foods, Inc.'s avowed expert may have assisted in the inclusion of his report and testimony as evidence recognized by the law as admissible. Lacking this devolves its avowed status to that of inadmissibility. What remains is to see whether Foods' embalming by the bankruptcy process will lead to an afterlife of the sort contemplated by the drafters of the Bankruptcy Code or its presence will be one of ashes and dust continually redistributed by the winds of a contentious storm known as a lawsuit among the sands of litigation for far longer than otherwise would have been its earthly life's cycle.

C. **The Procedural Implementation.**

For the reasons, findings, and conclusions set forth in this opinion, the Andrews/Bush/Winston Defendants' motion in limine to exclude from admissible evidence Mr. Hart's testimony and report is granted. In the event the trustee is unable to present admissible evidence of liability for a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B)(i) (2004), for a recovery under 11 U.S.C. § 550(a) (2004) for the fraudulent transfer claims in count one and the preference claims in count three, and damages for the civil conspiracy claims in count two and the conversion claims in count six of the restated and consolidated complaint, summary judgment will be entered against the trustee and in favor of the defendants on these counts. These rulings are to be set forth in a separate order incorporating what is contained in this memorandum opinion.